**UNITED STATES of America**

v.

**Matthew J. CIANCIULLI, Jr., Joseph R. Ricca, Anthony Fiorentino.**

**Crim. Nos. 79–165–1, 79–165–2 and 79–165–6.**

United States District Court, E. D. Pennsylvania.

Dec. 17, 1979.

Peter F. Vaira, U. S. Atty., Philadelphia, Pa., Jack Meyerson, Dept. of Justice, Crim. Div., Washington, D. C., Peter F. Schenck, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Jeffrey M. Miller, Philadelphia, Pa., for Cianciulli.

Helen T. M. McCaffrey, Philadelphia, Pa., for Ricca.

Ivan J. Feiner, Philadelphia, Pa., for Fiorentino.

## MEMORANDUM OPINION

BECHTLE, District Judge.

Presently before the Court are the post-trial motions of defendants Matthew J. Cianciulli, Jr. ("Cianciulli"), Joseph R. Ricca ("Ricca") and Anthony Fiorentino ("Fiorentino") for judgment of acquittal, arrest of judgment and new trial, pursuant to Fed.R. Crim.P. 29, 33 and 34. After a careful and exhaustive examination of the relevant statutes, decisional law, the record and arguments of counsel, in their briefs and at oral argument, the motions were denied by the Court's Order dated October 23, 1979, and the within Memorandum Opinion is in support thereof.

The case concerns alleged criminal conduct perpetrated by 25 defendants and approximately 15 unindicted actors through a pattern of conspiratorial and individual activities in falsely registering to become eligible to vote in federal elections. The evidence adduced at trial showed a common course of conduct over a three-year period, beginning in 1975 and occurring in the 1st ward in the 13th division of the 183rd state legislative district in the City of Philadelphia. The 49-count criminal indictment was returned by the grand jury after two years of investigation, which involved the interviewing of approximately 120 witnesses by the Federal Bureau of Investigation ("FBI"), the Pennsylvania Crime Commission, the Philadelphia Voters Commission and the examination of approximately 30 witnesses before the federal grand jury. The indictment charged 25 defendants with conspiracy to encourage false registration, 42 U.S.C. § 1973i(c); [1] giving false information for the purpose of establishing eligibility to register to vote, 42 U.S.C. § 1973i; and, conspiracy to injure citizens in the exercise of their constitutional rights, 18 U.S.C. § 241.[2] Eight of the 25 defendants

---

1. 42 U.S.C. § 1973i(c) provides:

 (c) Whoever knowingly or willfully gives false information as to his name, address, or period of residence in the voting district for the purpose of establishing his eligibility to register or vote, or conspires with another individual for the purpose of encouraging his false registration to vote or illegal voting, or pays or offers to pay or accepts payment either for registration to vote or for voting shall be fined not more than $10,000 or imprisoned not more than five years, or both: *Provided, however*, That this provision shall be applicable only to general, special, or primary elections held solely or in part for the purpose of selecting or electing any candidate for the office of President, Vice President, presidential elector, Member of the United States Senate, Member of the United States House of Representatives, Delegate from the District of Columbia, Guam, or the Virgin Islands, or Resident Commissioner of the Commonwealth of Puerto Rico.

2. 18 U.S.C. § 241 provides:

 If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or

 If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured—

 They shall be fined no more than $10,000 or imprisoned not more than ten years, or both; and if death results, they shall be subject to imprisonment for any term of years or for life.

were additionally charged with aiding and abetting others to falsely register to vote through the use of false addresses and false periods of residence in the state legislative district, 18 U.S.C. § 2.[3] Defendant Cianciulli, who at the time of the indictment was the Pennsylvania state representative from the 183rd legislative district, was also a resident of the political ward involved and had been involved in local politics there for several years and, according to the Government, was the principal beneficiary of the registration fraud. He was charged with four counts of mail fraud for allegedly using the mails for transmittal of false mail voting registration forms, in violation of 18 U.S.C. § 1341.[4] By Memorandum Opinion and Order dated August 30, 1979, this Court ordered *sua sponte* severance of the case into three separate trials, pursuant to the Court's express and inherent powers under Fed.R.Crim.P. 14 and based upon the interests of due process and judicial economy. *U. S. v. Cianciulli*, 476 F.Supp. 845 (E.D.Pa. 1979). Pursuant to that Order, defendants Cianciulli, Ricca, Fiorentino, Joseph Asnes ("Asnes"), Vincent Lombardo ("Lombardo")

and Ramon Meirino ("Meirino") were tried together in the first trial commencing on September 7, 1979. Two of the 25 defendants pleaded guilty prior to commencement of the first trial. Prior to the presentation of testimony, two days of hearings were held on various suppression motions and one day was spent in selecting the jury of twelve with four alternates. The trial proceeded for eight days, during which the testimony of 64 witnesses was heard and the introduction of some 140 exhibits was received. Of the 64 witnesses, the defense presented 24 witnesses. The defendants did not testify. On September 18, 1979, as a result of an incident involving a hallway communication made to an alternate juror by the brother of defendant Fiorentino, the jury was ordered sequestered for the remainder of the trial. The verdict was returned on September 24, 1979, after the jury had deliberated for three days. The jury found five of the six defendants guilty on a total of 19 counts and acquitted them on the remaining 26 counts of the indictment.[5] The remaining 17 defendants

**3.** 18 U.S.C. § 2 provides:
 (a) Whoever commits an offense against the United States or aids, abets, counsels, commends, induces or procures its commission, is punishable as a principal.
 (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

**4.** 18 U.S.C. § 1341 provides:
 Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Post Office Department, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is

addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

**5.** The jury verdict was as follows: Defendant Cianciulli was found guilty of one count of conspiracy to encourage false registration, 42 U.S.C. § 1973i(c); nine counts of aiding and abetting, 18 U.S.C. § 2; and, one count of conspiracy to injure citizens in the exercise of their constitutional rights, 18 U.S.C. § 241. He was acquitted on nine counts of aiding and abetting and four counts of mail fraud, 18 U.S.C. § 1341. Defendant Ricca was found guilty of one count of conspiracy to encourage false registration; three counts of aiding and abetting; and, one count of conspiracy to injure citizens in the exercise of their constitutional rights. He was acquitted on two counts of aiding and abetting. Defendant Lombardo was found guilty on one count of giving false information for the purpose of establishing his eligibility to register to vote, 42 U.S.C. § 1973i(c), and he was acquitted on one count of conspiracy to encourage false registration and one count of conspiracy to injure citizens in the exercise of their constitutional rights. Defendant Meirino was found not guilty on all four counts in which he was charged. Defendant Fiorentino was found guilty of one count of giving false information for the purpose of es-

awaiting trial as a result of severance pleaded guilty to various counts after the first trial. Post-trial motions were filed by the defendants who were convicted at trial on September 26 and October 1, 1979. Sentence was imposed on October 4, 24, 25 and November 8 and 9, 1979, and an appeal was filed on October 25, 1979.

### I. *Prosecutorial Misstatements*

The first and perhaps quintessential issue raised by the defendants in their post-trial motions concerns the constitutional propriety of certain direct and indirect comments made by the Government during the course of its closing and rebuttal arguments which allegedly concern the failure of the defendants to testify at trial. The defendants contend that these remarks violated the letter as well as the spirit of the prohibition established in *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), because they could have been construed by the jury as a comment on the fact that the defendants invoked their right not to testify. In *Griffin*, the United States Supreme Court held:

> [T]he Fifth Amendment, in its direct application to the Federal Government and in its bearing on the States by reason of the Fourteenth Amendment, forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt.

380 U.S. at 615, 85 S.Ct. at 1233.

The basic test to determine whether a violation of due process has occurred was recently articulated by the Court of Appeals for the Third Circuit in *U. S. v. Waller*, 607 F.2d 49 (3d Cir. 1979) (*per curiam*). The *Waller* court held:

> The test for determining whether a remark constitutes an improper comment on an accused's failure to take the stand

in his own behalf is "whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *United States v. Chaney*, 446 F.2d 571, 576 (3d Cir.), *cert. denied*, 404 U.S. 993, 92 S.Ct. 543, 30 L.Ed.2d 546 (1977).

At 50. *See also Slakoff v. U. S.*, 8 F.2d 9, 11 (3d Cir. 1925); *U. S. v. Gatto*, 299 F.Supp. 697, 703 (E.D.Pa.1969).

In order to assess whether "[a] jury would naturally and necessarily take [the prosecutor's remarks] to be a comment on the failure of [an] accused to testify," it is necessary for the reviewing court to step into the shoes of the jury to evaluate what was heard, seen and perceived by it within the context of the totality of the trial. Stated in the converse, the reviewing court must be careful to avoid using an approach that isolates words, sentences and phrases out of the context of the trial in an attempt to determine their meaning and impact on the minds of the jurors who were part of the trial that included the very comments in question. A detached, "reasonable person" approach cannot comport with the pronouncements set forth in *Griffin*. The Court is also compelled to determine whether the comments of the prosecutor were made in response to an earlier defense challenge, invitation or strategy, or in response to testimony presented at trial to the jury. The two pivotal questions under the test are: (1) What was intended by the comments?"; and (2), despite the prosecutor's intent in his remarks, "What would the jury—in the context of the *total* trial—'naturally and necessarily' draw from the challenged words?" The authorities teach us that what is or is not prejudicial varies from case to case and that there are no fixed rules available that prohibit the use of

tablishing eligibility to register to vote; and he was acquitted of one count of conspiracy to encourage false registration, one count of aiding and abetting and one count of conspiracy to injure citizens in the exercise of their constitutional rights. Finally, defendant Asnes was found guilty of one count of giving false infor-

mation for the purpose of establishing eligibility to register to vote, and he was acquitted on one count of conspiracy to encourage false registration and one count of conspiracy to injure citizens in the exercise of their constitutional rights.

certain words or phrases. *See U. S. v. Armedo-Sarmiento*, 545 F.2d 785, 793 (2d Cir. 1967); *U. S. v. Handman*, 447 F.2d 853, 856 (7th Cir. 1971); *Rodriguez-Sandoval v. U. S.*, 409 F.2d 529, 531 (1st Cir. 1969); *U. S. v. Venable*, 443 F.Supp. 178, 182 (E.D.Pa. 1977); *U. S. v. Gatto, supra*, 299 F.Supp. at 703.

### A. *Language Concerning "Stonewalling"*

In their post-trial motions, the defendants have objected to two particular sets of remarks that the Government made during the course of its closing and rebuttal arguments. First, the defendants contend that the following remarks, made during the course of the Government's rebuttal argument, violated the rule established in *Griffin v. California*:

> Another question that was asked by a number of defense attorneys that merits a response is, "Well, why were these Government witnesses here immunized when some of these defendants are on trial?"
>
> Well, very simple: It is because eventually and perhaps reluctantly before the grand jury these individual voters did finally tell the truth and they did agree to testify who was really behind their false registration.
>
> That's not the case with the defendants in this courtroom. Their stonewalling has persisted throughout this trial.
>
> Mr. Lombardo said to the FBI that, "When my handwritten form was filled out, my mail-in registration form, Mr. Cianciulli wasn't even there." That's what he said to Agent Lovelace. And that's just not true. He didn't come clean.
>
> The same thing with Mr. Asnes. He said once to the Crime Commission, he said he lived there; another story to the FBI; he refused to come clean and say the circumstances surrounding his registration.
>
> The same with Mr. Fiorentino: He registered at an address he didn't live, refused to offer any explanation as to why he did that.

> The same with Mr. Meirino: He gave a statement he didn't even know Ted Barone. He gave a statement that he, in fact, lived at that address, refused to come clean.
>
> That's the difference between these defendants and the Government witnesses. They were given immunity because they were able to get to the circumstances behind the crime, who was responsible for the systematic pattern of false registrations.

N.T. 8–13 to 15.

Let us consider the test articulated by the Third Circuit Court of Appeals in *U. S. v. Waller, supra*, that is alternative in nature. First, would the natural and necessary effect of the remarks be to comment on the defendants' failure to testify? Or, second, were the comments made intentionally?

#### (1) *Natural and Necessary Effect*

Various factors have been considered by the courts to determine whether the natural and necessary effect of a prosecutorial remark was to comment on the failure of a defendant to testify. At the outset, a violation of the *Griffin* prohibition is often found in those situations where the defendants are the only witnesses available who could provide exculpatory evidence that would negate or rebut the Government's evidence. *See U. S. v. Smith*, 421 F.2d 1229, 1230 (3d Cir. 1970); *U. S. v. Giuliano*, 383 F.2d 30, 35 (3d Cir. 1967); *Linden v. U. S.*, 296 F. 104, 106 (3d Cir. 1924); *U. S. v. Gatto, supra*, 299 F.Supp. at 703.

Cases where the defendant is the sole available witness usually arise where the only persons present at the scene of the crime are the defendant and the victim or a Government agent. In these situations, if the Government agent testifies, for example, that an illegal sale of drugs had taken place between the agent and the defendant, then the only possible witness who could refute that evidence would be the defendant himself. A prosecutorial comment to the jury, therefore, suggesting that the jury should have heard more testimony can *only*

cause the jury to *naturally* look to the *only* other evidence there is—the defendant— and, hence, this could be a prohibited comment on the defendant's failure to testify. In cases where other witnesses or exhibits are available, or have been presented by the defense, a comment by the prosecutor concerning the defense's evidence would not naturally and necessarily be considered to be a comment on the failure of the defendants to testify, because the remark could have been directed to the other evidence which was or could have been presented.

A classic example of the application of the "sole witness" theory is found in *Linden v. U. S., supra,* which is much relied upon by the defendants. In *Linden,* the only persons present during an illegal sale of liquor were the three defendants and two United States Customs officers, who later testified for the Government. The only persons who could have testified to refute the Government's evidence were the defendants themselves. It is easy to see that the only conclusion that could have been drawn from the following remarks by the trial judge was that the comments referred to the defendants' failure to testify:

> Now, as to that count there is very little to be said. If you believe the evidence, and there is no contradiction of it at all, these three men were caught in a boat on the Shrewsbury River, in what is called the Cove between the Highlands and Sandy Hook, with a lot of intoxicating liquor on board. You heard the testimony with reference to that. Now, there is not any evidence at all in explanation of that transaction, and there you have the bare facts. I don't understand that counsel for the defendant makes any serious contention in that regard.

296 F. at 105–106 (emphasis in original).

In contrast to the *Linden* decision is the case of *U. S. v. Smith, supra,* where our very own Third Circuit Court of Appeals reviewed a case involving a defendant who had allegedly given an alias name to the FBI. The defense strategy, presented only through cross-examination of Government witnesses, was that the name was not used as an alias but was the defendant's professional stage name. Although the prosecutor remarked during his closing statement that, "if a man has something to say in his defense, he should say it," the *Smith* court held that no violation of *Griffin* resulted. The court held:

> Defendant could have called third party witnesses to establish his innocent use of a professional name. In such a situation the quoted response does not fall within *Griffin v. California, supra. United States v. Giuliano,* 383 F.2d 30 (3d Cir. 1967); *United States v. Heithaus,* 377 F.2d 484 (3d Cir. 1967).

421 F.2d at 1230. *See also U. S. v. Bartemio,* 547 F.2d 341, 346 (7th Cir. 1974) ("Likewise, we find that the government's reference to certain evidence as being 'uncontradicted and uncontested' could not have naturally and necessarily been taken by the jury as a comment upon Appellant Brennan's right not to testify . . . Brennan was not the only person who could have challenged or contradicted such evidence. Indeed any of the other participants could have rebutted such evidence."); *U. S. v. Giuliano, supra,* 383 F.2d at 35 (unlike *Linden,* in his remark, the district attorney was pointing to his own evidence and not to the defendant; in addition, other potential witnesses were available).

A similar situation occurred in the case of *U. S. v. Gatto, supra,* 299 F.Supp. 697 (E.D. Pa.1969), where it was alleged that certain prosecutorial remarks were violative of *Griffin.* The court held that:

> [a]lthough the defendants in this case could have testified on the subject of whether a legitimate siding business was being conducted, witnesses other than the defendants also could have so testified: employes, customers, suppliers, creditors, etc. Indeed, the proof could have rested on the proffer of certain documentary evidence: account books, sales receipts, insurance policies, etc. It was not to call attention to the defendants' failure to

testify, then, but to their failure to offer proof that this comment was directed. . . .

299 F.Supp. at 703.

In the instant case, contrary to the assertions of defense counsel at oral argument, other witnesses were not only available but many actually testified in a defense attempt to exculpate every one of the convicted defendants. Therefore, in contrast to the "sole witness" setting of *Linden*, the *Griffin* prohibition does not apply to the challenged comments here.

The following items from the record clearly indicate that this is not a sole witness case: First, as to all of the defendants, many witnesses were called by the Government who admitted under direct and cross-examination that, although the address they had supplied to register to vote was false, they believed that what they had done was not "illegal."[6] This testimony went directly to the major defense offered by the defendants—namely, that the acts which they committed were not done "knowingly or willfully," as required for a violation of 42 U.S.C. § 1973i(c) and 18 U.S.C. §§ 241, 2 and 1341. They argued instead that the acts were done out of inadvertence or mistake.[7] More precisely, counsel for defendant Cianciulli argued in his closing argument to the jury that, as to those particular Government witnesses:

> . . . many of [these] witnesses called by the Government I would have called as witnesses if they hadn't testified because their testimony was favorable to Mr. Cianciulli. They continued to show one after another a lack of criminal intention,

6. For example, the following immunized Government witnesses testified as to the issue of intent to falsely register: Charles Lynch, N.T. 1–242 (did not think he violated any criminal laws at the time); George Daly, N.T. 2–54, 55, 61 ("To me it was like illegally parking a car, getting a traffic ticket or something. I felt as though I wasn't doing anything deeply wrong . . . I didn't believe I was doing anything criminal. . . ."); Steve Manion, N.T. 2–73 (did not think at time that he was violating any criminal laws); Joan Donaldson, N.T. 2–112, 113 (never thought that it was a criminal violation); Kenneth Donaldson, N.T. 3–50 (in his mind thought "absolutely not" committing a crime); Carmen Pungitore, N.T. 4–59, 60 ("I didn't think anything was wrong with it, because I was only voting one time."); Angelo Sannutti, N.T. 4–75 to 77 ("I didn't think nothing was wrong as long as you vote once . . . I just used an address I didn't live at."); Richard DeAngelis, N.T. 4–84, 85 (did not think anything wrong when registered to vote); Nicholas Pisano, N.T. 4–107 to 109 ("Not a crime, definitely not . . . I didn't think I was doing anything illegal. Morally wrong, but illegal I didn't realize."); Walter Middleton, N.T. 4–133, 134 (did not know it was a crime, ". . . I was in the same district, I thought, and I was doing someone a favor, you know."); Elaine Middleton, N.T. 4–166, 166A (saw nothing illegal about her acts); and, Anthony Pisano, N.T. 4–198, 199 ("And I was not quite sure it was illegal or—I knew it was not right. I cannot say I knew definitely that it was illegal to register. I thought if I didn't vote, it didn't matter. It was just—it is something that nullifies itself.").

7. Illustrative of this position were the statements of Cianciulli's defense attorney in his closing remarks to the jury when he stated:

> But if the activities of these people in allegedly conspiring together in filling out the registration forms was done out of accident, mistake, or other innocent reason, it's not a crime. It doesn't mean it is correct, but it is not a crime.
>
> There's a difference between filling a form out wrong and violating the law. If you apply for a driver's license, maybe you have a girl friend who wants a driver's license sent to her house because you're there occasionally, you live somewhere else, so you put down her address on the form. Harrisburg calls you up and says, "By the way, sir, is that your residence? Do you live there most of the time? All the time?"
>
> You say, "No."
>
> "Well, you can't do that. We'll send you another form."
>
> What you have done is improper, but it is not a crime. You didn't have the intention to violate the law. What you did was out of innocent reason, accident, or mistake.
>
> \* \* \* \* \* \*
>
> There must be proof beyond a reasonable doubt, clear and convincing evidence, that the defendants, or Mr. Cianciulli specifically, that the defendant Cianciulli intentionally did an act which he knew the law forbids. That's specific intent. In other words, he knew it was the law and just knocked it over and said, "I'm doing it anyway." Where is the evidence of that?

N.T. 8–115, 116.

a lack of being forced to vote for somebody.

N.T. 8–120.

Therefore, as defense counsel stated,[8] the testimony given by these immunized Government witnesses as part of the defense strategy would have been presented by the defense if it had not been presented by the Government—presumably to negate the criminal intent not of the witnesses, but of the defendants themselves. The jury did not agree with this argument, as the verdict demonstrates, but no counsel knew that when the summations were made. The defendants were, therefore, not the sole witnesses available to present their major defense as to the issue of intent.

Second, the § 1973i(c) claim that the defendants, excluding defendants Cianciulli and Ricca, registered from an address at which they did not live involved a legal issue that ultimately turned upon the construction of Pennsylvania statutory and decisional law on residency for purposes of registering to vote. The issue, under state law, was whether the defendants were in fact legally residing at the addresses from which they had registered in 1975 and 1976. A critical element of the federal criminal statute requires that the person register from an address at which (s)he * does not live, as required by the applicable state election law. The Government sought to show that the false registrants had never lived in, and in many cases had never set foot in, the residences listed on the registration forms. The Government did this through the use of the testimony of a real estate salesman, owners, tenants and neighbors who actually resided at the very same addresses from which these defendants had registered. This, too, then was clearly perceived by the jury as proof that the defendants were not the only witnesses available to prove that they, in fact, had or had not lived at those addresses which were contended by the Government to be false.

Specifically, as to defendant Ricca, during the two-year investigation preceding this indictment, he stated to the FBI and to the federal grand jury that he had *in fact* lived at 1427 South 6th Street and, therefore, his registration to vote from that address was valid under Pennsylvania election law.[9] At trial, defendant Ricca attempted to further reinforce these pre-indictment statements through the testimony of several witnesses. Anthony Lucidino was called as a defense character witness and testified that Ricca had lived at the 1427 South 6th Street address in the same apartment as defendant Cianciulli. Confronted with evidence that there was only one bedroom in the apartment, Lucidino testified that Ricca had slept in the living room.[10] Additionally, defense character witness Dr. Leopold Salkind testified that he had treated Ricca for influenza at the 1427 South 6th Street address.[11] Finally, a Government witness, Salvatore Cannistraci, who lives at 1427 South 6th Street, stated that he had seen Ricca at that address a few times but was unclear as to whether Ricca actually lived at that address.[12] The combined testimony of these three defense witnesses could be viewed as having an exculpatory effect or as having the effect of corroborating Ric-

---

8. It should also be noted that counsel for defendant Asnes made extensive use of the testimony of these same Government immunized witnesses in his closing argument in order to attempt to exculpate his client on the question of criminal intent (*see* N.T. 7–50 to 52); the theory clearly being that the jury should consider Asnes' intent to be no more serious than those who testified as to similar conduct.

* Please note, in any instance where either "he" or "she" could be used without changing the meaning or sense of the thought being expressed, the symbol "(s)he" will be used.

9. Although defendant Ricca was not specifically charged with registering from an address at which he did not reside under § 1973i, evidence of this act was presented to establish an overt act for purposes of the charge against Ricca of conspiracy to encourage false registration under § 1973i.

10. Testimony of September 20, 1979, on cross-examination by the Government, as indicated in the Court's bench notes and in the Court Reporter's official notes.

11. *Id.*, on direct examination.

12. N.T. 1–165, 166, 177, 178, 180.

ca's prior statements to the FBI and federal grand jury that he had in fact lived at that address at the time he registered to vote. The evidence was offered to prove that he was not guilty of the overt act necessary to sustain the charge of conspiracy to encourage false registration to vote. Plainly, defendant Ricca was not the sole witness available to prove that critical fact. Indeed, Ricca's defense counsel in her closing remarks stressed the testimony of Lucidino and others in an attempt to establish that Ricca did live at that address.[13] Furthermore, in the context of this "sole witness" discussion, it is reasonable to assume that, if Ricca had in fact lived at the 1427 South 6th Street address, there would have been other available witnesses to substantiate this factual assertion (e. g., other neighbors, friends and/or employees).

As to defendant Fiorentino, the Government presented the owner of the house containing the apartment from which defendant Fiorentino and his wife had registered. This owner testified that neither Fiorentino nor his wife had ever lived at that address.[14] Again, the Court believes that the jury could naturally conclude that persons other than the defendant could testify that Fiorentino had in fact lived at that address (e. g., his wife, friends, relatives and/or neighbors). Therefore, in the case of defendant Fiorentino under the § 1973i count for false registration, he was not the only witness who could have countered the Government's evidence concerning false registration and residence.

Another specific example may be derived from the aiding and abetting counts against defendant Ricca, because there were other witnesses besides defendant Ricca himself who could have favorably testified for him on those counts. Ricca's defense attorney, in her closing speech to the jury, attempted to persuade the jury that Ricca had not aided and abetted the individuals named in the indictment, by reviewing in great detail the testimony of those persons named as being aided and abetted by Ricca and who had testified for the Government as immunized witnesses. Ricca's attorney contended that Ricca had not asked any of those persons to falsely register because each witness had testified under oath that he had not. [N.T. 7–67, 68, 71.] She also contended that Ricca had not accompanied any of them to defendant Cianciulli's grocery store, where they had actually falsely registered [N.T. 7–67 to 68], or to official registration centers to register falsely. [N.T. 7–71.] Therefore, there were other witnesses besides defendant Ricca who were available to testify to exculpate him. In fact, the jury acquitted Ricca on two counts of aiding and abetting two persons who had testified at trial. Ricca was charged with aiding and abetting Raphael Norcisa ("Norcisa"), who did not testify at trial. Again, from the viewpoint of the sole-witness approach, the defense could have presented Norcisa as a witness to attempt to show that Ricca was not guilty of aiding and abetting on that particular count. See comments by counsel for both sides on Norcisa.[15]

---

**13.** The Court is careful to note that, because other witnesses were available to testify for the defense, but were not presented, does not mean nor was the jury instructed that the defendants had the burden of presenting any witnesses or any evidence at all. It was instructed quite the contrary. N.T. 8–92 to 94. Under *Griffin*, which is not a burden-of-proof case but a prosecutorial comment case, it is necessary for the Court to examine whether the defendants were the sole witnesses available to exculpate themselves or whether other witnesses were available, *so that a questionable comment by the prosecutor would naturally and necessarily not be taken to be a comment on the defendants' failure to testify. See U. S. v. Lipton*, 467 F.2d 1161, 1168 (2d Cir. 1972); *U. S. v. Smith*, 421

F.2d 1229, 1230 (3d Cir. 1970); *U. S. v. Giuliano*, 383 F.2d 30, 35 (3d Cir. 1967); *U. S. v. Gatto*, 299 F.Supp. 697, 703 (E.D.Pa.1969).

**14.** N.T. 4–91 (testimony of A. J. Fanelli).

**15.** N.T. 7–73, 74; 8–25. Contrary to the additional contention in defendant Ricca's post-trial motions, these remarks by the Government concerning the failure of the defense to produce Norcisa were not improper. *See* note 13, *supra*. Further, the Court did, contrary to the defendant's claim, give an instruction concerning the burden of proof and production of witnesses by the defense in its charge to the jury; therefore, a separate charge in regard to Count 36 was not necessary. [N.T. 8–92 to 95, 99.]

These representative examples clearly show that this case is not comparable to the cases where the defendants were the only persons available to testify in rebuttal to the Government's evidence. The plain fact is that this case is not within the *Griffin* prohibition from the sole-witness vantage point, because the jury cannot be said to have naturally and necessarily taken the Government's rebuttal remarks to be a comment on the failure of the defendants to testify because many other witnesses were called or could have been called to support the defendants' contentions in rebutting the Government's case.

It is appropriate at this juncture for the Court to note that, while the *Griffin* prohibition commonly arises in the consideration of those situations where the defendant is the sole witness available, there can be situations where, even if other witnesses are available, a questionable comment is so strong and so direct that it can only be understood to be a comment on the failure of the defendant to testify. For example, in *Berryman v. Colbert*, 538 F.2d 1247 (6th Cir. 1976), the prosecutor made the following remark during his closing speech:

Now, finally, to establish the robbery murder, the felony murder, we are relying almost entirely upon circumstantial evidence. Nobody was there when the robbery took place. Nobody that we can bring here to testify. *The defendants here, yes, but we can't get them to testify.*

538 F.2d at 1249 (emphasis in original). No other meaning could be attributed to that remark other than that it was a clear, direct and gratuitous reference to the defendants' failure to take the stand and the prosecutor's inability to do anything about it, thus placing the solution to the evidentiary vacuum squarely on the defendants' shoulders. Such a statement, by its own terms, can have only the meaning barred by *Griffin*. *See also Eberhardt v. Bordenkircher*, 605 F.2d 275 (6th Cir. 1979) (the prosecutor's closing argument, as recapitulated by the court: "After criticizing the inadequacy of the defense witnesses, . . . reminded the jury indirectly but emphatically that

the defendant had not taken the stand in his own defense. With this final argument, the prosecutor gestured toward the defendant."); *Rachel v. Bordenkircher*, 590 F.2d 200, 202 (6th Cir. 1978) (prosecutor remarked, "We will never know, these men won't tell us. The only other man who could tell us is dead and in his grave. . . ."); *U. S. v. Smith*, 500 F.2d 293, 295 (6th Cir. 1974) (prosecutor commented in his closing speech, ". . . I would ask that the defendants satisfy you that there is no other reasonable explanation. If they have some reasonable alternatives to suggest as to what the calls mean, then I leave with you now, you then require them to show that to you."). These cases have no application here.

The language used in the Government's final argument in the case before us is, at the very worst, ambiguous if considered with a perception of all of the evidence heard by the jury and when viewed, as it must be, as a reasonable, accurate and permissible reply to defense counsel's challenge to the Government in their closing arguments that preceded the comments in question. Secondly, and quite aside from measuring the natural and necessary effect of a comment in a "sole witness" case or a direct-challenge case, courts have sought to make the measurement by consistently holding that any questionable remark by the prosecution, even if ambiguous, must be examined in the full panorama of statements made prior to the questionable remark and the evidence presented at the trial in order to accurately assess whether the natural and necessary effect of the comment was to demean the defendants' failure to testify at the trial, thereby causing the prejudice of *Griffin*. *See U. S. v. Dansker*, 537 F.2d 40, 63 (3d Cir. 1976) ("We think it clear that the prosecutor was merely highlighting the failure of defense counsel, in their summations, to challenge critical evidence against their clients . . . [defense counsel made no] effort to explain away this conversation in their closing arguments . . . the prosecutor was well within the bounds of legitimate advoca-

cy."); *U. S. v. Armedo-Sarmiento*, 545 F.2d 785, 793 (2d Cir. 1976) (the Government stressed credibility and lack of contradiction of own witnesses where contradictory testimony was available from defense witness); *U. S. v. Somers*, 496 F.2d 723, 741 (3d Cir. 1974) ("It is well settled that a prosecutorial misstatement made in response to, and in rebuttal of, an improper inference suggested by defense counsel will not result in reversible error."); *U. S. v. Bartemio*, 547 F.2d 341, 346 (7th Cir. 1974) (remark dealt with evidence in record and credibility of witnesses); *U. S. v. Gimelstob*, 475 F.2d 157, 163 (3d Cir. 1973) (response by prosecution was directed to failure of defense counsel to cross-examine a Government witness and to attack by defense on credibility of Government witness); *U. S. v. Giuliano*, 383 F.2d 30, 34 (3d Cir. 1967) (general comment on Government's affirmative case is permitted); *U. S. v. Heithaus*, 377 F.2d 484, 486 (3d Cir. 1967) (defendants deliberately opened the door by attacking credibility of Government witnesses, therefore, justifying the response by the prosecution in an attempt to rebut the attack upon its evidence—fair rejoinder); *U. S. v. Gatto*, 299 F.Supp. 697, 703 (E.D.Pa.1969) (comment on failure of defendants to offer proof is permitted).

In the present case, the Government contends that the remarks in question were made in response to the attack on the credibility of prosecution witnesses and to the argument of various defense counsel to the jury that the conduct of the Government witnesses was identical to the defendants' conduct and that no justification existed for the prosecution of the defendants while the Government witnesses were granted immunity. Throughout their closing arguments, three different defense attorneys emphatically and unmistakably challenged the prosecutor to articulate in his final argument, which they knew was about to be presented to the jury by the prosecutor, the difference in the behavior of the defendants on trial and that of the many witnesses called by the Government who had been false-but-immunized registrants. For example:

Ladies and gentlemen, those who cooperated were immunized. Those who changed their testimony were immunized. You saw on the stand your very selves a person made an original statement and for all intents and purposes those statements were honest. The next thing you know, the FBI is in and they didn't like that statement; they switch the statement and the next time they testified at the Grand Jury, the statement changed again. They came into court, the statement changed again under cross-examination, the tool of the defense.

Ladies and gentlemen, this case has been manipulated and conglomerated. People changed their testimony because they didn't want to be prosecuted. They weren't criminals. "How could I be a criminal; I didn't do anything wrong."

Every witness came in here and said that to you: "I didn't know I was doing anything wrong." Yet they came in and they got immunity. It doesn't make sense. It doesn't make sense and there is only one way to stop this and I started to suggest it and I got excited, but there is only one way to stop it, and that's a not guilty, ladies and gentlemen.

Let the Government know that, to use their money for things of importance. But to pick some people out is wrong. You heard it. Think about that testimony. Think about how all those witnesses came on here and changed it all around: The first time, the Pennsylvania Crime Commission was one thing. The next thing, it is the FBI; another thing.

N.T. 7–43, 44 (closing statements of counsel for defendant Lombardo).

Now, [the prosecutor] made seven suggestions as to what the circumstances may be to lead you to believe and to conclude that these defendants acted criminally.

I would like to for a moment submit to you ladies and gentlemen that if indeed the defendants' behavior is criminal, then the behavior of all of the Government witnesses was equally criminal.

Now, that being true—and you have heard testimony from perhaps 10 or 15

witnesses for the Government who were virtually in the same legal position as these defendants—you all remember that, I assume. Now, you have got approximately 20 or 25 people who are in this alleged state of criminal mentality.

N.T. 7–49, 50 (closing statement of counsel for defendant Asnes).

When the witnesses, the Pisanos, husband and wife, agree, "We did it," no problem; the Government let's them go.

The Middletons, "I voted twice, once here and once in New Jersey," same election, registered twice, no problem, let them go.

The Donaldsons, same thing, no problem, let them go.

But Anthony Fiorentino, the construction worker, the ironworker, "Get him. He must be guilty. He lives in South Philadelphia. Let's get him."

This is horror. This is horror. Jack Meyerson, the United States Attorney, the Special Prosecutor for this, said, "He lied." Wasn't that his action, "Anthony Fiorentino lied"?

He lied? You have heard what Anthony has said, what has been said.

To quote the scripture to you, "He who is without sin, cast the first stone."

N.T. 7–58 (closing statement of counsel for defendant Fiorentino).

■ The Court, having been in the presence of the jury during the entire trial and having seen, heard and perceived all of the evidence, finds that, first, the remark was intended to be and was a fair response to an attack by the defense on the credibility of nearly all of the Government's witnesses. The defense had posed to the jury the ques-

tion as to why these witnesses changed their testimony from prior pre-indictment statements to the FBI, the grand jury and other authorities after being immunized. The Government, being invited to respond, was entitled to respond and did so by stating that, unlike the defendants in this case, the immunized witnesses decided, perhaps reluctantly, to "come clean" and admit that they had lied during the two-year inquiry by the various federal, state and local investigating authorities about their registering to vote. The thread of this pre-indictment pattern of lying to the investigating agencies leads directly to the second response included in the Government's rebuttal comments regarding the challenge raised with the jury by the defense as to why these defendants were on trial while various Government witnesses who had committed identical acts with a similar state of mind were granted immunity. The Government attempted to answer this defense thrust in its rebuttal by acknowledging that the witnesses who were immunized had some similarities and some dissimilarities with the defendants on trial. It was pointed out that both had previously lied, said nothing or "stonewalled" *prior to indictment* and that the trial evidence proved it. The reference was to the giving of false information to register to vote, in interviews by either the FBI, the Pennsylvania Crime Commission, Philadelphia Voters Commission or in questioning before the federal grand jury. The evidence, the Government argued, clearly reflected the failure to tell the "whole truth" and the various inconsistencies between the defendants' prior pre-indictment statements and the evidence as presented through the testimony of witnesses at trial.[16] However, unlike the de-

---

16. The following exemplify inconsistencies or failures to tell the "whole truth" between the defendants' pre-indictment statements to the various authorities and the evidence as revealed at trial, to which the Government was referring: (1) Defendant Cianciulli told the Philadelphia Voters Commission that the Donaldsons and John Lombardo lived at 1427 South 6th Street [N.T. 2–133] but, when he talked to the Pennsylvania Crime Commission at a later date, he said he was not familiar with those persons [N.T. 2–145, 147, 149]. He also told the Pennsylvania Crime Commission that George Daly lived at that address but, at the

trial, Daly testified that he had never lived at that address [N.T. 2–43, 45—Daly said Cianciulli gave him address from which to register and that he had never lived at that address]. Further, Salvatore Cannastraci, a resident of 1427 South 6th Street, testified that the Donaldsons, Lombardo and Daly never lived at that address [N.T. 1–162 to 165]. Defendant Cianciulli also told the Philadelphia Voters Commission that Joan Donaldson lived at the 1427 South 6th Street address [N.T. 2–133] but later told the Pennsylvania Crime Commission that he was not familiar with Joan Donaldson [N.T. 2–145, 147, 149]. At the trial, Joan Donaldson

fendants, the Government's immunized witnesses, in effect, had "come clean" and eventually told the truth "before the grand jury" as the Government stated. [N.T. 8–14.] They admitted making prior false statements or omissions of truth to the various authorities.[17] The fair and reasonable meaning that can be attributed to the Government's comment concerning "coming clean" is that, unlike the immunized wrongdoers who repented pre-indictment, the defendants had not "come clean" during the

testified that she had never lived at the above address but that Cianciulli had helped her to register to vote and told her to use the above false address as her address on the voter registration form [N.T. 2–107, 110, 111]; (2) Defendant Ricca told the FBI that he lived at the 1427 South 6th Street address at the time he registered to vote on a "couple" of occasions but never intended to move from his other permanent address and that he registered to help Cianciulli [N.T. 5–31, 32]. At trial, his counsel took the position that he lived at that address for purposes of establishing his eligibility to vote [N.T. 7–63 to 66]. As will be discussed later, under Pennsylvania law, in order to establish a voting residence a person must intend to make that address his or her permanent address and abandon the prior address. Ricca also told the FBI that he had not suggested to William Romanini ("Romanini") that he register for Cianciulli using a false address [N.T. 5–34, 35]. At trial, Romanini testified that Ricca had asked him to register for Cianciulli and that Ricca gave him his voter registration card, after being mailed to Ricca's address, even though Romanini told Ricca that he thought what he was doing was illegal [N.T. 1–188, 190, 218]; (3) Defendant Lombardo told the FBI that Cianciulli had not filled out his voter registration form but some girl had and that Cianciulli was not even present at the time it was filled out [N.T. 3–91]. At trial, an FBI handwriting expert testified that Lombardo had signed his registration form, but that Cianciulli had filled out the form based on a comparison of handwriting exemplars [N.T. 6–120, 127, 131 to 133 (Hallet)]; (4) Defendant Fiorentino told the federal grand jury that he had never lived at the address from which he had registered [N.T. 4–217], but there was evidence at the trial that he had made a prior statement to the Pennsylvania Crime Commission that he had in fact lived at the address from which he had registered to vote [N.T. 4–266]. At trial, the owner of the house from which Fiorentino had registered testified that Fiorentino had never lived at that address [N.T. 4–91 (A. J. Fannelli)]. Also, an FBI handwriting expert testified that Fiorentino had signed his own registration form [N.T. 6–134]; and, (5) Defendant Asnes, when interviewed by the Pennsylvania Crime Commission, told them that he had lived at 1429 South 6th Street for one year before the interview on June 23, 1977, but later, in the same interview, told them that he lived there the past three months [N.T. 4–257, 259]. Later, when he talked to the FBI, he said that he never lived at that address and admitted to the FBI that he had previously lied to the Pennsylvania Crime Commission [N.T. 5–37, 41, 74, 75]. At the trial, the owner of the above address said he was not sure if Asnes had ever lived at that address, although the owner had previously told a federal grand jury that Asnes had never lived at that address [N.T. 6–74 (J. Berti)]. Also at trial, an FBI handwriting expert testified that in his opinion Asnes had signed his voter registration form that contained the 1429 South 6th Street address as his place of residence [N.T. 6–124, 125, 131].

17. For example, see the trial testimony of the following Government immunized witnesses: Charles Lynch [N.T. 1–232, 234]—admitted that he had never lived at the address from which he had registered to vote and that he also lied as to his period of residence at that address; William Romanini [N.T. 1–198, 229, 230]—admitted that he lied to the Pennsylvania Crime Commission and the federal grand jury and that he had never lived at the address from which he had registered; George Daly [N.T. 2–38, 49 to 51, 56 to 58]—stated that he had lied to the Pennsylvania Crime Commission and the FBI but said he told the truth to the federal grand jury at a later date—also stated that he never lived at address from which he registered; Kenneth Donaldson [N.T. 3–28, 40] —lied when registering about address and period of residence; Charles Wadsworth [N.T. 3–105]—admitted he gave false address to register; Theodore Barone [N.T. 3–196, 206]—stated he gave false address to register to vote; Carmen Pungitore [N.T. 4–57, 59, 60]—admitted he never lived at address from which he registered; Angelo Sannutti [N.T. 4–63, 70, 71, 76]—said gave false address to register and false period of residence and that he lied to Pennsylvania Crime Commission; Richard DeAngelis [N.T. 4–79, 80]—admitted he gave false address and period of residence; Nicholas Pisano [N.T. 4–97]—stated at trial he did not live at address from which he registered; Joanne Pisano [N.T. 4–110, 112, 115]—stated she did not live at address she registered from and gave false period of residence; Walter Middleton [N.T. 4–120, 129]—never lived at address registered from and gave false period of residence; Elaine Middleton [N.T. 4–158]—did not live at address registered from; Elizabeth Pisano [N.T. 4–201, 202]—stated she never lived at address from which she registered and also lied as to her period of residence there.

pre-indictment inquiry, either before the grand jury or in interviews with the various authorities. These inconsistencies and failure to tell the "whole truth" were shown at trial by the evidence.

The Court finds that this was a fair, responsive and invited argument by the Government offered to meet its burden of proof and give the jury the response it was entitled to expect in the face of the questions raised by the defense in their closing arguments. It should also be noted that this position of the Government was not first presented in its rebuttal argument but had been raised and emphasized throughout the trial, beginning in its opening statement to the jury.[18] The inconsistencies were further emphasized by the Government in its closing remarks to the jury when, in a defendant-by-defendant analysis, it was pointed out that prior pre-indictment statements of the defendants were contrary to the evidence presented at trial and how various defendants had, therefore, been proven to have not told the "whole truth" to the various authorities prior to indictment.[19]

The present case is closely analogous to the case of *U. S. v. Heithaus*, 377 F.2d 484 (3d Cir. 1967), where the court stated: "By deliberate choice the defense focused attention (upon a particular issue in the case) . . . The prosecutor did no more than

rebut this attack upon his evidence by reminding the jury in general terms that the testimony in question was uncontradicted and unimpeached. Such comment was a fair rejoinder that had been invited by the defense." 377 F.2d at 486. Similarly, here the defense opened the door by raising a challenge to the Government to answer the question of why the defendants were on trial when certain Government witnesses who had committed the same acts were not. The Government simply offered a fair rejoinder to that challenge in an effort to answer the question raised and thereby avoid the possibly harmful situation of leaving the defense's question unanswered.

The prosecutorial decision to stress prior inconsistent statements or pre-indictment silence is permissible under the holding of *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), relied upon by the defendants. In *Doyle*, the Supreme Court held that comments at trial by the prosecutor, concerning the silence of the accused after arrest when questioned by law enforcement authorities, was violative of the Fifth Amendment right against self-incrimination. The *Doyle* rule, however, did not extend to comments concerning the silence of the accused or inconsistencies in his statements *prior* to indictment or arrest. These latter types of comments were ex-

---

**18.** In particular regard to defendant Cianciulli's failure to tell the "whole truth" to the Philadelphia Voters Commission and the Pennsylvania Crime Commission prior to indictment, the Government, in its opening to the jury, stated:

You will hear Mr. Maressa who works for the Philadelphia Voters Commission, who was just doing a routine check, a street list, which is made up from the registration list, who went to 1427 South Sixth Street in December of 1975 and talked to Matt Cianciulli about who of the people registered from that address lived there. You will hear Maressa tell you what Matthew Cianciulli said and he will tell you that Matthew Cianciulli told him that people lived in that address, who the evidence will show clearly did not live at that address.

You will hear further from James DeBalt of the Pennsylvania Crime Commission who likewise questioned Matthew Cianciulli about the people at 1427, and you will again hear evidence that Matthew Cianciulli indicated that people live there who did not live at that address or who had moved out of that ad-

dress when they had, in fact, never lived there.

N.T. 1–36.

**19.** N.T. 7–16 to 22, 26. Exemplary of this prosecutorial strategy was the following statements by the Government in its closing statement:

The fourth factor that suggests that, indeed, these defendants did not honestly believe that what they were doing was proper is that each of them at some point in time did not come forward and candidly and truthfully tell authorities what had occurred. You know, after the fact, when we get into courtrooms, there is often a gloss put over earlier activities: "Yes, we cooperated with the authorities," and, "Yes, we came forward and said we honestly believed that you could register where you didn't live."

That's not what occurred in this case. Let's take the defendants one by one. . .

N.T. 7–16.

pressly authorized in *U. S. v. Chaney*, 446 F.2d 571 (3d Cir. 1971). There, the prosecutor commented in his closing arguments on the defendant's failure to mention certain important information in a prior pre-arrest interview with the FBI. At trial, this important information was disclosed by the testimony of various witnesses and that tended to indicate an unexplained silence on the part of the defendant prior to arrest. The *Chaney* court held:

> The statements of the prosecutor which are objected to came during a long review by him of the events occurring around the time of the robbery and the contradictions between what defendant told the FBI agent and the testimony of various witnesses. Viewed in the context of the prosecutor's entire address, we think it clear he was charging that defendant Chaney lied by not mentioning Sheppard. We do not think those statements, in this situation, even though phrased in the present tense, were such as would lead the jury to conclude that the prosecutor was commenting on the failure of the accused to testify. *See Hayes v. United States* [368 F.2d 814 (9 Cir. 1966)], *supra; cf. United States v. Smith*, 421 F.2d 1229, 1230 (3rd Cir. 1970).

446 F.2d at 576.

The instant case can be favorably compared with the *Chaney* decision. Here, the prosecutorial commentary regarding the silence of certain defendants, on their not telling the "whole truth" and on their lying—characterized by the Government as "stonewalling"—to the authorities to prevent them from reaching the kernel of the scheme prior to indictment, is virtually identical to the facts in *Chaney*. For example, when questioned by the FBI, defendant Lombardo was asked if Cianciulli had filled out his voter registration form, to which he replied in the negative, and stated that a girl unknown to him had filled out the form and that defendant Cianciulli was not even present. [N.T. 3–91.] At trial, it was shown through an FBI handwriting expert, using handwriting exemplars of the defendants, that *Cianciulli* had filled out Lombardo's registration form. [N.T. 6–120, 127, 131, 132.] Lombardo's failure to tell the "whole truth" to the FBI constituted "stonewalling" and is representative of the "stonewalling" of the defendants prior to indictment. Another example is that of defendant Cianciulli's pre-indictment failure to tell the Pennsylvania Crime Commission and the Philadelphia Voter Commission that he had filled out numerous registration forms for persons who had never lived at the 1427 South 6th Street address, as was stated on the form.[20] In addition, the

20. N.T. 2–133, 145, 147 to 149. At trial, many of the persons Cianciulli had previously reported to the authorities as having lived at the 1427 South 6th Street address testified that they never lived at that address and that it was Cianciulli who had given them the false address from which to register to vote [N.T. 2–43 (Daly)] [N.T. 2–107, 110, 111 (Joan Donaldson)].

This failure to tell the "whole truth" to the various authorities prior to indictment, being a form of "stonewalling" or silence by failure to tell the "whole truth," was referred to by the Government earlier in its rebuttal argument as to defendants Ricca and Cianciulli when it stated:

> Is there a difference between the 20 or so Government witnesses you heard from and some of these defendants?

> Let's talk first about Mr. Cianciulli and Mr. Ricca.

> Now, with regard to the Government's witnesses, they registered once. They registered at an address at which they didn't live. That's the extent of their knowledge of what was going on.

> But that's very different from the knowledge that Mr. Cianciulli had. Mr. Cianciulli knew that literally dozens of persons were registering from an address at which they didn't live.

> Mr. Ricca, he knew that his employees, Romanini, Aldinger, Wadsworth, Russell, his relatives, Mike Ricca, John Lombardo, Vincent Lombardo, Rafael Norcisa, he knew that they were all registering from addresses at which they didn't live.

> It is very different to know about one registration and to see the whole pattern as Mr. Cianciulli did and as Mr. Ricca did. So clearly they are in a very different category from the Government's witnesses themselves.

Government, by emphasizing these failures to tell the "whole truth," was responding to or attacking the position taken by the defendants throughout the trial that the defendants had in fact cooperated with the various authorities and did not try to hide or conceal important information.[21]

Turning to the Government's use of the phrase, "[t]heir stonewalling has *persisted* throughout this trial," we find that it was a comment on the cumulative appearance of several of the Government witnesses, many of whom had been immunized, but who were nevertheless reluctant to testify at trial against the defendants. This reluctance was evidenced by inconsistent testimony of these witnesses and general lapses of memory as to critical facts that an unindicted witness should or could have remembered.[22] In this context, the prosecutor said

> Well, how about the other four defendants? N.T. 8–11.
>
> But think for a minute. The very fact that these people came into this courtroom and flipped on their grand-jury testimony because they didn't want to hurt Mr. Cianciulli and others shows that they did, in fact, know that what had gone on was wrong. The fact that these witnesses like the defendants earlier gave false statements to the FBI and authorities again shows a consciousness of guilt. N.T. 8–12.
>
> I strongly dispute the fact that because you say something to law enforcement it necessarily means you have got nothing to hide.
>
> If the inspector from the Registration Commission had gone out to see Mr. Cianciulli and said, "I'm here to ask you about certain people who live here," and Mr. Cianciulli did not talk to him, obviously that would be an awareness that Mr. Cianciulli was involved in something wrong. But he talked to him and he lied to him. The only way it is valid to talk about candor is if they were entirely truthful. If they are not truthful, it is a coverup. The mere fact you talk doesn't mean you don't have something to hide.
>
> Each of the witnesses in this case when they were on the witness stand were asked the question, "Examine that form, and what, if anything, is false about it?" They all examined the form. They looked at the form. They said, "The address is false." They knew what was wrong with the form. They knew where they told earlier lies to the FBI. They knew why they were at best reluctant Government witnesses—because they were not terribly anxious to point the finger at Mr. Cianciulli and others for the crime of false registration. N.T. 8–13.

21. For example, *see* opening statement of attorney for defendant Cianciulli [N.T. 1–43, 44]; opening statement of attorney for defendant Lombardo [N.T. 1–48]; closing statement of attorney for defendant Asnes [N.T. 7–46, 47]; closing statement of attorney for defendant Ricca [N.T. 7–72 to 74]; closing statement of attorney for defendant Cianciulli [N.T. 8–112]. Typical of this defense contention was the following statement by Cianciulli's attorney:

> The Government argued to you that he confessed, I suppose, or he gave inconsistent statements to investigators. Nothing could be further from the truth. The very fact that Mr. Cianciulli talked to investigators is indicative of something. If you had committed a crime and you heard there was an investigation, investigators came out to see you, if you were the skilled, evil politician that they say Mr. Cianciulli is, who is dealing in the back room, would you sit down and talk to investigators?
>
> In fact, when he talked to one investigator, Mario Rissa, he told him that certain people no longer lived there. They were then struck from the voting list as a result of that. If Mr. Cianciulli was really out to get those 18 or 20 votes, he never would have told them that. He would have tried to grab every vote he could.
>
> Basically all the defendants in this case talked with the FBI, told them the truth. Doesn't that tell you something? When a person is guilty of something, he runs and hides. He goes and gets an attorney and says, "Go talk to the FBI." He doesn't show up and say, "Sure, I'll talk to you, what do you want to know? Sure, I'll come to the Grand Jury." Almost everybody came to the Grand Jury and talked. N.T. 8–122.

22. Representative examples of witnesses who were called, and in some cases immunized, but who "stonewalled" at the trial, out of an apparent desire to hold back anything that could possibly help the prosecution, included the following: (1) Joseph Berti, owner of 1429 South 6th Street residence, testified at trial that he was not sure if defendant Asnes had ever lived at his apartment house, although before the federal grand jury he had previously testified that Asnes had not lived at that address [N.T. 6–64, 74]; (2) Anthony Pisano, immunized witness, had told a federal grand jury that Cianciulli had given him the address with which to register but, at trial, he said that he was not sure it was defendant Cianciulli who had given him the address [N.T. 4–187 to 189]; (3) Josephine DiMento, owner of 538 Wilder Street and who was also majority inspector in the 1st ward of the 13th division in the 1976 general

the following regarding these witnesses, in the rebuttal argument leading up to his "stonewalling" remark:

> Let's remember a couple things about these Government witnesses: Yes, the Government called them pursuant to subpoena, but as you yourself saw, many of them were very reluctant guests at this party. Had it not been for the fact that they had previously testified before the grand jury you would not have seen the full truth of their testimony. Fllows [sic] like Ken Donaldson, Charles Salerno, Josephine DiMento, Mr. Cianciulli's relatives, the Bertis, they came into court and had lapses of memory. They couldn't remember who lived next door until they got on cross-examination. Then when Mr. Miller or one of the other defense attorneys got up here and asked them questions; on cross-examination, it was, "Yes, that's right, Mr. Miller."
>
> "Yes, that's right, Mr. Pomerantz."
>
> The defense was basically able to put words in their mouths. And the reason that happened was they weren't necessarily sympathetic to the Government. They were more sympathetic to the defense.

N.T. 8–12.

Whether these witnesses were in fact "stonewalling" by reason of prior affiliations or current allegiances to any of the defendants was not a question for the Court to answer, but was rather a question the jury had a duty to consider in its search for the truth. The critical issue is whether the Government was attempting to meet this circumstance by urging the jury to determine whether these *witnesses* had "stonewalled" during the trial, as opposed to implying that the *defendants* themselves had "stonewalled" by refusing to testify. The Court finds that the *former* was the natural and necessary conclusion that the jury would come to. This is clear when the Government's initial rebuttal remarks, quoted above, are read in conjunction with the later "stonewalling" reference and within the context of the totality of the trial.

Finally, the Government's rebuttal remark that "stonewalling" was "persisting" throughout the trial should also be considered in connection with a point raised in its closing statement to the jury. The Government referred to defendant Cianciulli's attempt to conceal his true handwriting characteristics in the furnishing of his handwriting exemplar. The handwriting exemplar, a non-testimonial statement submitted during trial, was used by an FBI handwriting expert. The Government in its first address to the jury stated:

> The fifth factor that I would point out to you—and again, with reference to Mr. Cianciulli—that he did not honestly believe it was proper to register where you didn't live is his dictated handwriting sample, and by "dictated handwriting sample," we mean this portion of Government's Exhibit 48–D, the upper left-hand corner.

election, had prior to trial told a federal grand jury that people had voted in that division who were registered from the address at which she lived but that they did not live there. At trial, she was unclear on this occurrence and generally evasive in answering questions. She had also told the prosecutors prior to trial that it was standard practice to check the addresses of the voters before they voted at the polling place, but at trial she said this was only done in rare cases when they were not sure if the person really lived at the address that was claimed [N.T. 4–235, 237, 241, 244, 245, 250]; (4) Kenneth Donaldson, immunized witness, had told the federal grand jury that Cianciulli had helped him straighten out a parking ticket problem, but at trial claimed that it was an eviction problem. Also, before the federal grand jury he said that Cianciulli had given him the false address with which to register to vote, but at trial he at first denied this was true and then, later in the trial, remembered that it was indeed Cianciulli. Finally, before the federal grand jury, Donaldson said that he had never lived at the 1427 South 6th Street address from which he registered, but at trial he claimed that he was intending to move to that address because of eviction problems prior to his registration. However, later during the trial, he admitted that he had lied when he claimed on the voter registration form that he had resided at the 1427 South 6th Street address for two months [N.T. 2–80 to 89; 3–24, 28, 36].

Now, remember, Agent Lovelace took the stand and testified that, "Before I took that sample from Mr. Cianciulli I told him that the purpose of the sample was that it was going to be analyzed by the FBI and compared with certain voter-registration affidavits."

Remember what the handwriting expert said about this dictated sample? He said—and I am quoting his very words—that it was not the normal style of handwriting, that it appeared to be primitive sort of stick figures.

Well, what happened is Lovelace told him what the handwriting sample was going to be used for. Cianciulli then came forward with what was not the normal style of handwriting, and in an effort to cloud the FBI's investigation, another consciousness of guilt. Fortunately, the FBI had 72 previous samples of Cianciulli's handwriting when he was relaxed and it was his normal style of handwriting, and on that basis we were able to bring before you the handwriting analysis that we did.

N.T. 7–22

■ In conclusion, this Court finds that the questionable remarks of the Government in its rebuttal argument did not naturally and necessarily have the effect of constituting a comment on any of the defendants failing to testify, when considered within the totality of the trial proceedings, but rather the remarks constituted: (1) a response to the challenge raised by the defense in their closing arguments concerning the credibility and immunization of several Government witnesses; (2) a reaffirmation of the prosecutorial strategy employed throughout the trial of presenting the inconsistencies and omissions in the defendants' pre-indictment statements and in the evidence at trial; and (3) a commentary on the "stonewalling" of the defendants that "persisted" throughout the trial—first, by the failure of the defense in general to present affirmative or rebuttal evidence and, second, indirectly through the apparent reluctance of certain immunized Government witnesses to testify against the defendants at trial and, third, by defendant Cianciulli's attempted alteration of his handwriting in an exemplar submitted during trial.

Lastly, courts in these cases often consider the merit of using curative instructions to the jury. The late Chief Judge William H. Hastie, writing for the Third Circuit Court of Appeals, stated in *U. S. v. Heithaus, supra,* that:

If some juror was thus reminded that the defendant had not testified, the court's subsequent instruction concerning the jury's duty to disregard the failure of the accused to testify minimized the risk of inferring guilt from such failure. On the facts of this case, the defendant was entitled to no more. . . .

377 F.2d at 486. *See also U. S. v. Waller, supra,* at 51; *U. S. v. Dansker, supra,* 537 F.2d at 63; *U. S. v. Chaney, supra,* 446 F.2d at 576; *U. S. v. Giuliano, supra,* 383 F.2d at 34–35; *U. S. v. McCrae,* 344 F.Supp. 942, 946 (E.D.Pa.1972), aff'd, 475 F.2d 1397 (3d Cir. 1973); *U. S. v. Gatto, supra,* 299 F.Supp. at 703.

■ The inquiry to be made by the Court here is whether a cautionary instruction can safely be said to have eradicated the possible effect of a prosecutor's questionable remark. The standard to be applied was articulated in *U. S. v. Smith,* 500 F.2d 293 (6th Cir. 1974):

The inquiry . . . must always be whether in the view of the whole record the impression conveyed to the minds of the jurors by irrelevant and prejudicial matter is such that the court may fairly say that it has not been successfully eradicated by the rulings of the trial judge, his admonition to counsel, and his instruction to the jurors to disregard it.

500 F.2d at 297–298, *quoting Pierce v. U. S.,* 86 F.2d 949, 952 (6th Cir. 1936). With this standard as a guide, we find that the Court's admonition in the charge had the effect of dispelling any prejudicial effect caused by the Government's remarks.

First, contrary to the assertions of the defendants,[23] the Court did in fact give a prompt and complete instruction on the duty of the jury not to draw any unfavorable inference from the fact that the defendants had not testified. The Court stated in its charge to the jury:

It is a constitutional right of a defendant in a criminal trial that he should not be compelled to testify. No presumption of guilt may be raised and no inference of any kind may be drawn from the failure of a defendant to testify. The law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or offering any witnesses or producing any evidence of any kind. No lack of evidence on a defendant's part will rectify a failure of proof by the prosecution.

N.T. 8–91, 92.

This curative instruction was given as part of the Court's charge at the close of the case and immediately following the Government's rebuttal argument to the jury containing the questionable comments. Furthermore, the curative effect of the Court's instruction was further strengthened by several references of defense counsel during their closing speeches concerning this very same right of the defendants not to testify. Defense counsel said:

I suggest to you it is not the burden of Mr. Lombardo to tell you where he lived. It's the Government's to tell you where he lived, to show that he didn't live where he said he lived if he had said anything. And he doesn't have to say anything. The Government must prove its case.

\* \* \* \* \* \*

. . . [Y]ou may not draw any negative inference from one's failure, if you can call it a failure—and it shouldn't be considered a failure—bad use of words for me—to take the stand. My client didn't take the stand and he couldn't—and he didn't take that stand because he has a right not to. He has a right to sit there and let the Government prove its case.

And because you don't know what his educational background is, he is not a professional witness. I mean, you can look at him. I suggest he is not a professional witness. And I suggest to you that he may not have been able to come up there and be like someone who comes on the stand frequently, like an FBI agent or a professional handwriting expert.

\* \* \* \* \* \*

And you may not—and the judge will tell you you may not—and you have to maybe work hard not to be negative about the fact he didn't take the stand. But that's your responsibility as a juror. You must take that responsibility seriously . . .

There has been an evolution in this country of the law, and you know that law, and that says you can't say anything negative about this man for not taking the stand.

N.T. 7–38 to 40 (closing argument of counsel for defendant Lombardo).

Like Mr. Pomerantz said in his statement, there are many, many reasons why a defendant may not choose to take the witness stand. I am not going to explain them all to you. I don't think it is necessary. Because the only thing you really have to consider is what proof has been presented to each of you as to every element of the crime.

N.T. 7–47 (closing argument of counsel for defendant Asnes).

A similar situation arose in the case of *U. S. v. Giuliano*, 383 F.2d 30 (3d Cir. 1967), where the defense attorney stated in his closing argument to the jury:

I want to at this time make note of the fact, and I know you are possibly concerned with the fact that the defendant did not take the stand. *This honorable Court will tell you in so many words that the law does not compel a defendant in a*

---

**23.** *See* defendant Cianciulli's Supplemental Memorandum in Support of Post-trial Relief Relating to Improper, Unconstitutional Comments by Prosecutor Touching on Defendant's Failure to Testify, at 2.

*criminal case to take the witness stand
and testify.* And no presumption of guilt
may be raised and no inference of any
kind may be drawn from the failure of a
defendant to testify. I wanted to satisfy
your minds on that point because it possibly was bothering you.

383 F.2d at 32 (emphasis in the original).
The curative effect of this remark was considered by the *Giuliano* court as a positive
factor to support its holding that statements of the prosecution did not violate the
*Griffin* rule:

His own lawyer had reminded the jury of
exactly that same thing; had further told
the jury that the judge would instruct it
that the defendant had the unquestionable right to remain silent. . . .

383 F.2d at 34.

It should also be noted that the Court
strongly emphasized this principle in the
*voir dire* of the panel from which the ultimate jury was selected:

Also, in every criminal case a defendant has the absolute right, any defendant
has the absolute right not to testify, not
to offer evidence in his own behalf of any
kind. That is, a defendant under our
system has the right when charged with a
crime, these crimes or any other crime, to
come to court with his counsel and remain silent and say nothing.

Why? Because the burden of proof,
the burden of proving guilt in the United
States of America, is on the prosecution.
That's our system.

In some countries the burden of proof
is on the defendant to explain yourself.
We don't have that system in America.

So that means a defendant who is
charged with a crime can remain moot
[*sic*], so to speak, and simply sit there
and say nothing.

But the important part for jurors is
that that cannot be held against him. A
juror can't say, "Oh, well, he didn't get
up and say anything; he must be guilty."
That's not our system.

Now, these defendants all have attorneys and there may come a time in the
case when they'll decide if they want to
testify or not testify and they may not
know that now. But after they talk to
their attorney, a defendant may decide,
"I will not testify; I am prepared to
stand mute."

If any of these defendants would do
that, would anyone here hold that against
them?

N.T., partial transcript—*Voir Dire*, at 59–
60. No negative responses were made to
the question posed by the Court. Additionally, the Court repeatedly stressed that any
instructions on the law were the sole province of the Court.[24] The defense attorneys
themselves further reiterated this important concept to the jury in their closing
arguments,[25] with the consequence that it
was perfectly plain to the jury that, to the
extent that any counsel's statement on a
legal principle differed with the Court's, the
jury was to follow the Court. It is reasonable, absent clear evidence to the contrary,
to presume that jurors listen to, understand
and heed the clear and concise instructions
the Court delivers during the course of a
trial. *See Eberhardt v. Bordenkircher*, 605
F.2d 275, 280 (6th Cir. 1979); *Hall v. U. S.*,
84 U.S.App.D.C. 209, 211–212, 171 F.2d 347,
349–350 (D.C.Cir. 1949).

■ At post-trial oral argument, the defendants presented as an alternative theory
the argument that, even if a curative instruction had been given, it could never be
sufficient to cure the prejudicial effect of
the Government's rebuttal remarks. This
declaration of a *per se* principle is not supported by any decisional authority in any of
the federal circuit courts of appeals. While
it is true that, contrary to the holdings of
the Third Circuit Court of Appeals, the
First and Seventh Circuit Courts have
adopted the view that curative instructions
in some cases are insufficient, even these

---

**24.** *Voir dire* of the jury panel by the Court, at 8,
9; Charge of the Court to the jury at N.T. 8–60
to 62.

**25.** N.T. 7–58 (attorney for defendant Fiorentino); N.T. 8–103 (attorney for defendant Cianciulli).

courts have created an exception to this strict rule, holding that prejudice may be cured if the curative instruction is given immediately and with strong and clear language. See U. S. v. Flannery, 451 F.2d 880, 882 (1st Cir. 1971); U. S. v. Handman, 447 F.2d 853, 855 (7th Cir. 1971); Rodriguez-Sandoval v. U. S., 409 F.2d 529, 530 n.3 (1st Cir. 1969); Desmond v. U. S., 345 F.2d 225, 226–227 (1st Cir. 1965).

In the present case, a curative instruction was never requested by any defendant at any time. One explanation for this was offered at post-trial argument by Cianciulli's attorney, who stated that he had not requested a curative instruction prior to the Court's charge because he "knew" that the Court would give one.[26] Counsel cannot adopt a defense strategy of failing to request a curative instruction based on what counsel thinks the Court might do, await a favorable verdict and then, if the verdict is unfavorable, claim (albeit incorrectly) that a curative instruction was never given. See U. S. v. Waller, at 51 (3d Cir. 1979) ("If counsel had objected and asked for a curative instruction, we are confident that such an instruction would have eliminated any possibly adverse inferences.").

The Court notes that it consciously chose not to object sua sponte when the remarks were made, for fear of creating a problem where one did not exist. See U. S. v. Smith, 500 F.2d 293, 296 (6th Cir. 1974); U. S. v. Flannery, supra, 451 F.2d at 882; U. S.

v. Venable, supra, 443 F.Supp. at 183. Instead, the Court chose to give a curative instruction in its charge which was delivered within a matter of minutes following the Government's rebuttal argument.

The curative instruction pinnacled the prior instructions by the Court and statements by defense counsel on the right of the defendant not to testify. Thus, by the end of the trial, this point of law was firmly engraved upon the minds of the jurors. This case goes far beyond any of the decisional law holding that a cautionary instruction alone would be curative of any prejudice caused by a prosecutor's misstatement. The Third Circuit Court of Appeals has consistently held that a curative instruction alone can cure the prejudice caused by a prosecutor's questionable remark. See U. S. v. Waller, at 51; U. S. v. Giuliano, supra, 383 F.2d at 34–35; U. S. v. Heithaus, supra, 377 F.2d at 486; U. S. v. McCrae, 344 F.Supp. 942, 946 (E.D.Pa.1972), aff'd, 475 F.2d 1397 (3d Cir. 1973). In the instant action, the cumulative effect of numerous instructions and statements cured any possible prejudice that might have resulted from the Government's questionable remarks.

Therefore, the Court finds that, under the test set forth in U. S. v. Smith, supra, and even under the stricter test of U. S. v. Handman, supra, and U. S. v. Flannery, supra,[27] the cautionary climate created by

---

**26.** Statement of counsel for defendant Cianciulli at oral argument, as reflected in the Court's bench notes and Court Reporter's official notes (October 22, 1979).

**27.** The Court finds that the strictness of the test of prosecutorial intent of the First Circuit Court of Appeals in Desmond v. U. S., 345 F.2d 225 (1st Cir. 1965), and U. S. v. Flannery, 451 F.2d 880 (1st Cir. 1971), is not as strict as might appear on an initial reading of these cases. For example, in Flannery, the court strongly stressed that the only exception to the Griffin rule is if the court actually interrupts the prosecutor's argument immediately after the questionable remark is made and fully instructs the jury concerning the defendant's right not to testify. However, later in its opinion, the court made the following statement which indicates that it was "backing off" its

strict position by conceding the dilemma that courts are faced with in this area:

> Defendant did not object, perhaps fearful of making the matter worse, and the court's failure to interrupt may have been for the same reason. The government had no right, however, to place the defendant in this dilemma.

451 F.2d at 882. It is also noted that in U. S. v. Handman, supra, the Seventh Circuit Court of Appeals was addressing a factual situation where the prosecutor's questionable remarks were made in his closing speech and not his rebuttal. Therefore, if the court would have waited until the charge to give a curative instruction, this would obviously entail a longer period of contemplative time than if the curative instruction was given in the charge that would immediately follow the Government's rebuttal argument. Whether the Handman court

the Court's *voir dire* instructions, the curative instructions within the charge to the jury, the other instructions throughout the trial and correct statements of defense counsel in their closing remarks, on the right of the defendants not to testify, had the natural and necessary effect of curing any possibility of prejudice that might have occasioned by the remarks of the Government in its rebuttal.

#### (2) *Intent*

The second part of the alternate test set forth in *U. S. v. Waller, supra,* was whether the prosecutor's comment was intentionally made. As has been so often cited as the wellspring of prosecutorial behavior, the statements of the United States Supreme Court in *Berger v. U. S.,* 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), is our starting point:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.
>
> It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will

be faithfully observed. Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none. . . .

295 U.S. at 88, 55 S.Ct. at 633. *See also Pierce v. U. S.,* 86 F.2d 949, 953 (6th Cir. 1936); *U. S. v. Smith,* 500 F.2d 293, 295–296 (6th Cir. 1974).

An examination of the cases in this area reveals that the issue of whether a comment was made intentionally only arises where no plausible or reasonable explanation is available to assess the meaning of the comments made. If there is no ostensibly proper matter which the remarks could pertain to, the only possible explanation available is that the remarks were intended to be a comment on a defendant's failure to testify. In the present case, the Government's remarks in its rebuttal can be interpreted as: (1) a response by the Government to the challenge raised by the defense in their closing arguments concerning the immunized Government witnesses; (2) a reiteration of the prosecutorial strategy of making a general comment on the evidence by explaining the inconsistencies and omissions in the pre-indictment statements of the defendants and the evidence presented at trial; and (3) commentary on the apparent reluctance of certain immunized witnesses to testify against the defendants at trial, and defendant Cianciulli to cooperate in submitting a handwriting exemplar during trial. Therefore, the Government's statements did not reach the depths of a gratuitous comment or a "stupid trick," as defined by the Third Circuit in *U. S. v. Giuliano, supra,* 383 F.2d at 34 (the prosecution's remarks "dealt with the Government's affirmative position and not with some completely stupid trick of advising the jury·that the defendant had not testified in

---

would have reached a different result as to the need for a prompt and immediate instruction if the remark had occurred in the rebuttal argument is unclear.

The strict test of *Flannery* was specifically rejected by the Sixth Circuit Court of Appeals in *U. S. v. Smith,* 500 F.2d 293, 296 (6th Cir.

1974), where the court held that any prejudicial effect would be better neutralized by a cautionary instruction given at the close of the Government's argument instead of interrupting the argument, which might more dramatically impress on the jury the prejudicial effect of the remark.

his own behalf."). *See also Rachel v. Bordenkircher,* 590 F.2d 200, 202 (6th Cir. 1978) ("It is apparent that the prosecution calculated these remarks to create in the jurors' minds an inference of guilt based solely on petitioner's election to remain silent."); *Rodriguez-Sandoval v. U. S., supra,* 409 F.2d at 531 ("Indeed, the very persistence of the government in making these remarks is proof that it attached much importance to them."); *Pierce v. U. S.,* 86 F.2d 949, 953 (6th Cir. 1936) ("Indulgence was designed rather than inadvertent, and an improper purpose its only explanation. That it was intended to prejudice the jury is sufficient ground for a conclusion that in fact it did so.").

In this context, the Court notes that, on the day before the Government's rebuttal argument, the defense, after objecting to the Government's characterization of "uncontradicted" evidence in its closing argument, referred the Court and the attorneys to several federal cases,[28] detailing the prohibition of *Griffin* and its progeny. The following day, the defense offered other similar cases[29] immediately prior to the Government's rebuttal argument. This notice or warning to the Government about the *Griffin* prohibition leads the Court to believe that the Government was aware of the prohibition articulated in *Griffin* prior to making its rebuttal argument. In light of the Government's otherwise proper conduct throughout the trial and the notice of the *Griffin* prohibition, the Court finds that the Government's remarks in its rebuttal argument were not intended to be prejudicial for the sake of prejudice alone, but were intended to be a fair and necessary response to legitimate factual issues.

This Court does not follow the strict approach taken by some other courts on the issue of prosecutorial intent. *See Rodriguez-Sandoval v. U. S., supra,* 409 F.2d at 531 ("We do not say that the government was contumacious. It doubtless believed that its remarks were at least arguably

consistent with our decisions. But one who attempts to define exactly the edge of the precipice approaches at his peril."); *U. S. v. Handman, supra,* 447 F.2d at 856. This Court finds the above approach too restrictive and untenable, in light of the prosecutorial duties defined in *U. S. v. Berger, supra,* and the underlying reasoning of the Supreme Court in *Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974), where the Court stated:

The "consistent and repeated misrepresentation" of a dramatic exhibit in evidence may profoundly impress a jury and may have a significant impact on the jury's deliberations. Isolated passages of a prosecutor's argument, billed in advance to the jury as a matter of opinion not of evidence, do not reach the same proportions. Such arguments, like all closing arguments of counsel, are seldom carefully constructed *in toto* before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear. While these general observations in no way justify prosecutorial misconduct, they do suggest that a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.

416 U.S. at 646–647, 94 S.Ct. at 1873.

The instant action differs in another important way from those cases where courts have granted mistrials due to the intentional comments of the prosecutor. In many of those cases, the comment concerning a defendant's failure to testify was not the only improper remark made by the prosecution during the trial, but exemplified simply one aspect of a course of impermissible conduct. Therefore, the cumulative effect of such a course of conduct has been held to naturally and necessarily prejudice the jury. *See Eberhardt v. Bordenkircher,* 605 F.2d at 278 (other trial errors adding to the cumulative

---

**28.** *U. S. v. Venable,* 443 F.Supp. 178 (E.D.Pa. 1977).

**29.** *Linden v. U. S.,* 296 F. 104 (3d Cir. 1924); *U. S. v. Handman,* 447 F.2d 853 (7th Cir. 1971); *U. S. v. Flannery,* 451 F.2d 880 (1st Cir. 1971).

prejudicial effect included introduction of mug shots and prosecutor's unfounded assertions that defendant's witnesses were being paid for their testimony); *Rachel v. Bordenkircher, supra,* 590 F.2d at 202 (prosecution also made references to petitioner's silence at the time of his arrest); *Kelly v. Stone,* 514 F.2d 18, 19 (9th Cir. 1975) (a district attorney's comment that, "If you can't find the defendant guilty on the facts that I have presented to you, I feel like I just might as well, you know, close up shop and go home," was deemed to be a "highly improper expression of personal opinion [and] constituted a veiled threat to the jury to return a guilty verdict."); *Pharr·v. U. S.,* 48 F.2d 767, 771 (6th Cir. 1931) (further references by Government to "misfortunes of women, widows, and orphans resulting from wrecking of the bank were in no sense pertinent to the presentation of the issues of the case, and were highly improper.").

Finally, in *U. S. v. Venable, supra,* the prosecutor, on four separate occasions in his closing argument, made improper comments and ignored the narrow line of *Griffin* with "all the delicacy and silence of a piledriver." 443 F.Supp. at 182. *See also Kelly v. Stone, supra,* 514 F.2d at 19 ("repeated assertions" made); *Rodriguez-Sandoval v. U. S.,* 409 F.2d 529, 531 (1st Cir. 1969) ("The prosecution hammered the point home relentlessly, stating in at least five different ways that its version of the December 26 happening was uncontradicted."); *Pierce v. U. S.,* 86 F.2d 949, 953 (6th Cir. 1936) ("misconduct of the prosecutors was neither slight nor confined to a single instance, but so pronounced and persistent that the cumulative effect upon the jury cannot be disregarded as inconsequential."). These cases do not apply in the case *sub judice.*

B. *Comment Concerning "Uncontradicted" Evidence*

■ Defendants claim that remarks made by the Government in its closing argument, as to the evidence being "uncon-

tradicted," was also violative of the *Griffin* doctrine. The comments objected to are as follows:

Literally dozens of people registered from one particular division within the City of Philadelphia when they didn't live there. You have heard testimony from many of these voters that they did so at addresses furnished to them by Defendant Cianciulli or by Defendant Ricca and, indeed, that Government evidence has come before you and has been uncontradicted. . .

N.T. 7–6.

The defendants rely upon the following decisions in support of their position that the use of the phrase "uncontradicted" is *per se* violative of the *Griffin* standard: *U. S. v. Flannery,* 451 F.2d 880 (1st Cir. 1971); *Desmond v. U. S.,* 345 F.2d 225 (1st Cir. 1965); *U. S. v. Handman,* 447 F.2d 853 (7th Cir. 1971); *Kelly v. Stone,* 514 F.2d 18 (9th Cir. 1975); *U. S. v. Nasta,* 398 F.2d 283 (2d Cir. 1968); *Barnes v. U. S.,* 8 F.2d 382 (8th Cir. 1925); and, *U. S. v. Venable,* 443 F.Supp. 178 (E.D.Pa.1977).

The defendants' contention is unstable for three reasons. First, as noted earlier, the rule in *Handman* and others was not that the use of the term "uncontradicted" was *per se* violative of *Griffin.* Rather, those courts held that a prompt and clear curative instruction by the Court would cure any possible prejudice. In the instant case, the cumulative effect of the Court's *voir dire* instructions, the remarks of counsel in their closing statements, other instructions of the Court throughout the trial and the Court's charge delivered immediately following the Government's rebuttal concerning the right of the defendants not to testify, all *in toto,* cured whatever prejudicial effect that the "stonewalling" and "uncontradicted" language might have had on the jury.

Second, the Third Circuit Court of Appeals has repeatedly adopted the position that the use of the term "uncontradicted" is permissible. This position was best expressed by the late Chief Judge William H. Hastie in *U. S. v. Heithaus,* 377 F.2d 484 (3d Cir. 1967), where he stated:

By deliberate choice the defense focused attention upon the credibility of certain witnesses for the prosecution and urged the jury to disbelieve them. The prosecutor then did no more than rebut this attack upon his evidence by reminding the jury in general terms that the testimony in question was uncontradicted and unimpeached. Such comment was a fair rejoinder that had been invited by the defense.

377 F.2d at 486.

This position has more recently been reaffirmed by the Third Circuit. *See U. S. v. Gimelstob,* 475 F.2d 157, 162 n.4 (3d Cir. 1973); *U. S. v. McCrae,* 344 F.Supp. 942, 947 (E.D.Pa.1972), *aff'd,* 475 F.2d 1397 (3d Cir. 1973). Other circuit courts have also adopted this position. *See U. S. v. Armedo-Sarmiento,* 545 F.2d 785, 793 (2d Cir. 1976); *U. S. v. Thurmond,* 541 F.2d 774, 776 (8th Cir. 1976); *U. S. v. Bartemio,* 547 F.2d 341, 345 (7th Cir. 1974); *U. S. v. Thompson,* 541 F.2d 794, 796 (8th Cir. 1976); *U. S. v. Taitano,* 442 F.2d 467, 468 (9th Cir. 1971); *U. S. v. Nasta,* 398 F.2d 283, 285 (2d Cir. 1968); *Carlisle v. U. S.,* 194 F. 827, 830 (4th Cir. 1912).

Obviously, these holdings do not allow the Government unbridled permission to use the word "uncontradicted" during the trial; but a reading of these cases shows the existence of other factors, viewed in the context of the entire trial, that justified the use of the word "uncontradicted" without offending the *Griffin* rule. *See U. S. v. Heithaus, supra* (any possible prejudice was cured by the court's full and proper instruction); *U. S. v. Gimelstob, supra* (comment was directed to the failure of the defendant's counsel to cross-examine a Government witness and was rebuttal to attack on Government witnesses' credibility); *U. S. v. McCrae, supra* (a reference to failure of defense to produce witness to rebut Government's evidence and court's curative instruction cured any possible prejudice that resulted); *U. S. v. Armedo-Sarmiento, supra* (was only response to argument raised by defendant's counsel and instruction cured in any case); *U. S. v. Thurmond, supra* (instruction cured and evidence was overwhelming); *U. S. v. Bartemio, supra* (not a sole-witness case because other witnesses available who could have challenged or contradicted the Government's evidence); *U. S. v. Thompson, supra* (not a sole-witness case so comment allowed because of the failure of defense to call witnesses to refute or contradict the Government's case); *U. S. v. Taitano, supra* (charge of court cured any possible prejudice and no objection made by defense counsel to the remarks at the time they were made); *U. S. v. Nasta, supra* (responding to argument of defense counsel, other witnesses available to refute Government's case, charge cured, evidence was overwhelming and no objection at time remark made but only motion for mistrial and no request for a curative instruction). Most of these factors have been previously discussed and are present in the instant action.

Lastly, as some of the aforecited cases show, the courts have held that the use of the phrase "uncontradicted" by the prosecution can be prohibited under *Griffin* "in the exceedingly rare case where the defendant alone could possibly contradict the government's testimony . . . ." *U. S. ex rel. Leak v. Follette,* 418 F.2d 1266, 1269 (2d Cir. 1969). As previously shown, the defendants were not the only witnesses who could have contradicted the Government's evidence because other witnesses were presented or could have been presented by the defense.

The only Third Circuit decision holding that the use of the phrase "uncontradicted" was violative of due process was *Linden v. U. S.,* 296 F. 104 (3d Cir. 1924). In *Linden,* the trial judge, and not the prosecutor, made the following statement during trial:

*Now, as to that count there is very little to be said. If you believe the evidence, and there is no contradiction of it at all, these three men were caught in a boat on the Shrewsbury River, in what is called the Cove between the Highlands and Sandy Hook, with a lot of intoxicating liquor on board. You heard the testimony with reference to that. Now, there is not any evidence at all in explanation of*

*that transaction, and there you have the bare facts.*

296 F. at 105–106 (emphasis in original).

As a direct result, the *Linden* court held:

Everyone accused of crime is presumed to be innocent until proven guilty. During the period of that presumption, one so accused may combat the evidence brought against him; or he may, if he choose, meet it in silence. That is his right. For its protection the law imposes corresponding silence upon prosecutor and court: Neither can validly refer or indirectly call attention to his failure to speak in his own defense. Being innocent in the eyes of the law, he is not called upon to meet accusing testimony by contradiction or explanation. Therefore, no presumption can lawfully be raised or comment lawfully be made upon his failure to do that which the law expressly says he shall not be required to do.

The apprehension and arrest occurred at night, out in a stream. The only persons present were the three defendants and the two customs officers. The latter were witnesses for the prosecution. It follows, therefore, that the only persons who could possibly contradict their testimony were the defendants themselves. Obviously, then, the only persons to whom the learned trial judge could have alluded as not having contradicted the government's testimony and as not having given an "explanation of the transaction" were the defendants. This is so clear that it does not require discussion. We are of opinion that this part of the court's charge involved error and that the conviction thereunder was not valid.

296 F. at 106 (citation omitted).

The *Linden* decision can be distinguished from the present action in several respects. At the outset, *Linden* was a sole-witness case and later decisions have distinguished *Linden* on similar grounds. *See U. S. v. Giuliano*, 383 F.2d 30, 35 (3d Cir. 1967) (unlike *Linden*, there might have been other witnesses available who could have been produced to contradict the Government's evidence other than the defendant); *Slakoff v. U. S.*, 8 F.2d 9, 11 (3d Cir. 1925) (other methods available to rebut Government's proof including presentation of documents, use of cross-examination, therefore, unlike *Linden* decision). Moreover, in *Linden*, it was the trial judge and not the prosecutor who made the remark. Therefore, any prejudicial effect such a direct remark might have otherwise had was further intensified because the person making the comment was the trial judge who sits in the role of the instructor of the law to the jury and whose comments, for practical purposes, are expected, and usually do, have a general aura of authority and believability on a jury.

Also, in *Linden*, the cumulative curative effect of the court's instructions and statements of defense counsel were not present as they are here.

■ Finally, the defendants also object to the following set of remarks by the Government in its closing argument to the jury:

The fourth factor that suggests that, indeed, these defendants did not honestly believe that what they were doing was proper is that each of them at some point in time did not come forward and candidly and truthfully tell authorities what had occurred. You know, after the fact, when we get into courtrooms, there is often a gloss put over earlier activities: "Yes, we cooperated with the authorities," and, "Yes, we came forward and said we honestly believed that you could register where you didn't live."

That's not what occurred in this case.

N.T. 7–16.

As has been previously discussed, the above type of remarks are not violative of *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), because they are a permissible comment on the failure of the defendants to tell the "whole truth" or remain silent to the various authorities *prior* to indictment or arrest. Therefore, *Doyle* is not applicable because it only concerned the failure to talk to authorities *after* arrest or indictment.

In conclusion, and for all of the above reasons, the Court finds that the rule of *Griffin* was not violated by either the "stonewalling" and "come clean" language in the Government's rebuttal, or by the "uncontradicted" language in its closing argument.

II. *Jurisdictional Application of 42 U.S.C. § 1973i(c) to 1975 False Voting Registrations*

The next assertion raised by the defendants is that any false voter registration occurring in 1975 is not within the jurisdiction of 42 U.S.C. § 1973i(c) of the Voting Rights Act of 1965, 42 U.S.C. § 1973 *et seq.*, because there was not a federal election in that year. The defendants rely upon the following jurisdictional language found in § 1973i(c):

> Whoever knowingly or willfully gives false information as to his name, address, or period of residence in the voting district for the purpose of establishing his eligibility to register or vote, or conspires with another individual for the purpose of encouraging his false registration to vote or illegal voting, or pays or offers to pay or accepts payment either for registration to vote or for voting shall be fined not more than $10,000 or imprisoned not more than five years, or both: *Provided, however,* That this provision shall be applicable only to general, special, or primary elections held solely or in part for the purpose of selecting or electing any candidate for the office of President, Vice President, presidential elector, Member of the United States Senate, Member of the United States House of Representatives, Delegate from the District of Columbia, Guam, or the Virgin Islands, or Resident Commissioner of the Commonwealth of Puerto Rico.

42 U.S.C. § 1973i(c) (emphasis supplied).

■ Defendants contend that only those people who registered to vote in 1976 would be subject to § 1973i(c) because there was a federal election in that year. The Court must note at this juncture that a party who claims the benefit of a statutory exception has the burden of proving that his particular claim falls within that statutory exception. *U. S. v. First City National Bank of Houston*, 386 U.S. 361, 366, 87 S.Ct. 1088, 18 L.Ed.2d 151 (1967). *See also* 2A Sutherland, *Statutory Construction,* § 47.11 (4th ed. 1973).

In order to determine the intent and meaning of § 1973i(c) and the proviso thereto, it is first necessary to briefly review the congressional history of that section. The original Senate version of the Voting Rights Act of 1965, designated Senate Bill No. 1564, did not contain the current § 1973i(c). That section was proposed by Senator Williams on April 13, 1965, after the bill left the Senate Judiciary Committee and was being debated on the floor of the Senate. 111 Cong.Rec. 7890 (1965). However, at the time of its introduction, the Williams amendment did not contain the jurisdictional qualifying language at issue here. That language was later proposed by Senator Ervin and eventually made part of the Williams amendment by a vote of the Senate on April 29, 1965. 111 Cong.Rec. 8988 (1965).

At the time of the amendment's introduction, Senator Williams made several statements as to the purposes behind the amendment:

> I have always been in favor of guaranteeing to every American citizen an equal opportunity to participate in the election process, but I feel just as strongly that this guarantee is meaningless if that vote is not counted properly, or if that vote is effectively canceled by a vote that is illegally cast, or if another person illegally registers to vote. I feel that the Congress, in its efforts to see to it that the integrity of a man's right to vote is protected, is obligated to see to it that the integrity of his vote itself is protected.

111 Cong.Rec. 8423 (1965).

Senator Miller, a co-sponsor of the amendment, also made the following remarks about the purposes of the amendment:

> We believe that section 14(d) of the pending voting rights bill is deficient.

First it limits its coverage to registration and voting under this act. There is no reason for limiting such coverage. Registration under this act or under any other act should be covered. There should be no loopholes. We should have clean elections—period; not clean elections under one act and unclean elections under some other act. The bill prohibits fraudulent registration. This is more difficult to prosecute than false registration, which is what our amendment prohibits. What cancels out the registration of an honest citizen is a false registration—fraudulent or otherwise. . . .

111 Cong.Rec. 8813 (1965).

After considerable debate, Senator Ervin proposed the "provided" language. Of particular interest to this legislative analysis were the remarks of Senator Ellender, who engaged in the following dialogue with Senator Williams over the jurisdictional reach of the amendment:

Mr. ELLENDER. In other words, the amendment of the Senator from Delaware would apply to all elections in all States?

Mr. WILLIAMS of Delaware. In all States and in all elections, it would be ridiculous to say that the Senate would condone payment to a man to vote once but would not condone it if he votes twice or that votes can be bought in one State and not in another.

Mr. ELLENDER. What is the Senator's justification for making it apply to a purely local election, say for mayor, for a representative in a legislature, for sheriff, or for any other local office?

Mr. WILLIAMS of Delaware. Solely because the bill itself so reads. The legislative counsel tried to draft this amendment to comply with other language of the bill. If a man is going to register and vote he should do so legally. In the amendment we are not dealing with the question as to whether the Federal Government should or should not have the right to intercede in a local election. The pending bill if it should be enacted into law answers that question. To pro-

vide otherwise the inference would be drawn that we were willing to have a fraudulent election at the local level, which is certainly not the intention. I believe that in any kind of election a man has a right to know that his vote after being cast properly will be counted properly. I see no objection to it being all-inclusive, and it was made all-inclusive.

Mr. ELLENDER. If the bill is enacted into law as presently written, and the amendment of the Senator from Delaware [Mr. Williams] is adopted, is it not a fact that the Senator's amendment would touch upon all elections, even one selecting a justice of the peace in a State?

Mr. WILLIAMS of Delaware. Yes, the Senator is correct, and so would the committee bill. It would follow the same pattern of the bill.

Mr. ELLENDER. If the bill is adopted along with the Senator's amendment, it would mean that in every election which would be held in a State, a township, or in a ward, the law would become effective?

Mr. WILLIAMS of Delaware. That is true. That is also true with the bill itself, assuming that it is adopted as otherwise written.

111 Cong.Rec. 8424 (1965).

In the same vein were the following remarks of Senator Hart:

Mr. President, [the bill] . . . applies to State and local elections, as well as to the Federal elections. That question, whether Congress has the power to insure fair election procedures in State and local elections, unless they are related to insuring the guarantees under the 14th and 15th amendments, is a very open one and a very serious one. This is the second reason which persuades us to hope that the amendment will not be agreed to.

\* \* \* \* \* \*

. . . [W]e do not attempt to reach State or local elections with a criminal sanction on payment for fraudulent registration in voting. Why? Because we had very grave doubt that on that basis we could. It is that point to which I reply.

It is not a piece of redtape or flimflam. It is a very serious problem.

111 Cong.Rec. 8431, 8433 (1965).

It is apparent that Senator Ervin proposed the jurisdictional addition to the Williams amendment to alleviate these concerns. At that time, Senator Ervin made the following remarks:

Mr. President, let me state briefly the reason why I offer my amendment to the pending amendment of the Senator from Delaware.

I am in favor of amendment No. 82. However, in my opinion amendment No. 82 in its present form is unconstitutional because it is not restricted to Federal elections. By the term "Federal elections", I mean elections in which presidential electors and Members of the U.S. Senate and Members of the U.S. House of Representatives are chosen.

The only effect of my amendment would be to confine the application of amendment No. 82 to Federal elections and thereby make it constitutional under the interpretation placed on the 15th amendment by the Supreme Court of the United States in a number of cases.

111 Cong.Rec. 8975 (1965).

After the Senate's passage of the revised amendment, it was proposed on the floor of the House of Representatives during the debate on the House version of the present Voting Rights Act of 1965. The House amendment was proposed by Representative Cramer on July 8, 1965. Representative Cramer made the following comments concerning the jurisdictional implications of the amendment:

There is no question about the constitutionality of the proviso which was adopted on the Senate floor and which I included in my amendment, making this applicable to Federal elections.

\* \* \* \* \* \*

So there would be no question of constitutionality I accepted the Senate amendment, and offered it in amended form before the Judiciary Committee. But, lo and behold, all these people who want to

do so much about voting showed pretty clearly they want to do it when it relates to somebody else's back yard, but when it gets to their own they take the attitude "we had better be reserved about Federal powers." That is what happened, that is the story. The committee turned down the Williams-Cramer clean elections amendments 19 to 15.

111 Cong.Rec. 15982 (1965).

At the same time, Representative Cramer made the following statements concerning the purposes and intent underlying the amendment:

Mr. CRAMER. Therefore, this section 12(e) is not limited to individuals registered by an examiner. So they contrived a broad remedy where any person is not entitled to vote but lo and behold, they would not give a person a remedy under my amendment if he falsely votes or falsely makes an application and lies to a registrar other than an examiner—no remedy. Outside of the places where the examiners are appointed, there is no remedy relating to lying to a registrar but there is under my amendment. And, therefore, I also say that there is nothing at all in the bill with regard to vote buying. So now if we want to do something all over America relating to everybody and not limited only to certain things and certain areas, you will vote for my amendment. You are going to have the opportunity to do so in the substitute offered, the McCulloch-Ford substitute. So I say for these two basic reasons, if for no others, the Celler committee bill should be substituted for the McCulloch bill. I want the citizens in all States to be first class citizens and not second class citizens. I want them to have the same rights as everybody else and not be discriminated against as it is under the Celler committee bill and under section 3, the pocket trigger.

111 Cong.Rec. 15983 (1965).

So if you want clean elections in America, if you want to clean up the elections throughout this country, support this amendment. It will apply universally to

the entire Nation. If you want those people who will be registered, as minorities, to have their votes mean something, then you will support this amendment, because you will not want their votes "watered down" by the stealing of other votes.

You can register all of the minorities you want, but if you turn around and permit other people to come in and register tombstones, to come in and provide false and fallacious and illegal absentee ballots, to come in and buy and procure votes, to come in to float voters from one voting precinct to another or from one county to another county—who do so intentionally, knowingly, willfully and purposefully to affect an election result—then you will just not give much of a remedy to these people to whom we are attempting to give voting rights today.

This applies to everybody. This provides for relief for everyone as it relates to preventing fraudulent voting.

111 Cong.Rec. 16246 (1965).

The amendment was passed without revision by the House on the day after its introduction. 111 Cong.Rec. 16281 (1965). The Williams-Cramer amendment was included without significant alteration by the Joint Conference Committee.

Therefore, the only interpretive evidence regarding the intent and meaning of the jurisdictional qualifying language at issue here are the statements made on the Senate floor by Senators Williams, Ellender, Hart and Ervin.

Under Pennsylvania law, registration to vote automatically qualifies the registrant to vote in any election for a two-year period, unless there is a change of address. 25 P.S. § 623–21; 25 P.S. § 623–40. If the registrant has voted in any election during that two-year period, the registration remains intact. If (s)he has not voted during that period, the registration lapses and there must be a re-registration. 25 P.S. § 623–40. Furthermore, a single registration entitles the registrant to vote in local, state and federal elections without the need for separate registrations for each election.

25 P.S. § 623–21; 25 P.S. § 623–2; 25 P.S. § 623–38.

With these state registration laws in mind, the Court must apply the proviso in § 1973i(c) to the instant facts, in light of the legislative goals. Two approaches will be taken.

■ From a literal viewpoint, the "provided" language only applies to "federal *elections*." That provision does not include a reference to "*registration*," even though the preceding general language of § 1973i(c) prohibits the use of false information for purposes of *registration, voting* or *conspiracy* to falsely register or illegally vote. In essence, the section prohibits three separate and distinct types of criminal behavior. A person can register legally using truthful information but vote illegally in an improper election district. Alternatively, a person can illegally register using false information but never vote at all. Therefore, interpreting the phrase "federal elections" in light of `the three-part thrust of the statute, the Court finds the phrase does not include registration activities.

This literal reading of the qualifying language of § 1973i(c) comports with the prior legislative concerns expressed by Senators Ellender, Hart and Ervin during the floor debate—namely, that the amendment should not apply to purely state or local "elections" for mayor, state representative or justice of the peace. 111 Cong.Rec. 8424, 8431, 8433, 8975 (1965). A concern for federal interference with *registrations* was not articulated. Therefore, under § 1973i(c), any purely state or local election occurring in 1975 in which persons illegally *voted* using false information would not be within the jurisdictional reach of § 1973i(c) because there was not a federal election in 1975.

■ Furthermore, an extrinsic approach to the qualifying language of the "provided" clause brings us to the conclusion that false registration alone can be a violation of the statute even in respect to registrations occurring in years where there is no federal election—such as 1975. Under state election law, a registrant does not register for

an election but rather secures a period of eligibility to vote in *any* election during that period.[30] In Pennsylvania, this is for a two-year period. Congress was aware of this pattern of eligibility when it enacted § 1973i(c).[31] Accordingly, any false registration can be the basis of a violation of § 1973i(c), because it creates an *eligibility* to vote in a federal election. This is true whether or not that registration occurs in the same year as a federal election. The construction urged by the defendants would be in derogation of the manifest congressional intent. If the defendants are correct, a person intending to vote in a federal election by means of a false registration need only wait until the "off year" to commit the false registration and then cast a vote in the following year. This result would undermine the congressional purpose under § 1973i(c) of providing a statute with "extraordinary scope and sweep" with which to stop illegal voting practices. This goal was to be achieved under the statute by prohibiting the actual casting of the illegal vote and to further prohibit registration using false information.[32] Congress determined that the evil of false registration is just as great as the evil of illegal voting—both present an equally grave threat to the integrity and honesty of the electoral system of the Nation.[33]

The major weakness with the defendants' analysis is that they are misconstruing the statute by adding into the statute the concept of an election "year," when the statute clearly says nothing about an election "year." Instead, it speaks of the act of "registration" and the act of "voting."

In the instant action, the persons who registered in 1975 using false addresses and false periods of residence became eligible, by that single 1975 act, to vote in the federal election in 1976.[34] The statute was aimed at prohibiting the exact type of activities that occurred in this case, as indicated by the following statements of Senator Williams during the Senate debate:

Mr. SALTONSTALL. My question is a simple one. Do I understand the Sena-

---

**30.** Whether Congress could establish by law a separate federal registration is unclear under its legislative powers under Article 1, section 4 of the United States Constitution. However, until the time that a separate federal registration is enacted, a system of general registration qualifying the registrant to vote in local, state and federal elections exists.

**31.** Representative Edwards made the following acknowledgment during the House debate over the Cramer amendment:

In the first article of the Constitution which authorizes the individual States to decide the qualifications of voters in both Federal and State elections, *subject only to the condition* that whoever is deemed qualified to vote for "the most numerous branch of the State legislature" is automatically qualified to vote in Federal elections.

The giving to the States of this responsibility was no casual decision. It has been reaffirmed again and again. . . .
111 Cong.Rec. 16012 (1965).

**32.** *See* statements of Senator Williams during Senate debate on his amendment, 111 Cong. Rec. 8428 (1965), and statements of Senator Dirksen concerning the testimony of Senator Williams on his amendment at Hearings before Senate Judiciary Committee on S.1564, 89th Cong., 1st Sess., April 5, 1965, at 803.

**33.** Senator Williams stated during the Senate debate on his amendment:

I do not wish any misunderstanding about what we are trying to achieve. We are trying to deal with two subjects—false registration and payments for registration and voting. First, we want to make sure that a person in registering does not knowingly or willfully give false information; second, we wish to make sure that anyone who pays or offers to pay a person or anyone who accepts *payment for casting his vote or for registering* would be in violation of the law. But beyond that, we do not intend to touch any of the other activities the Senator described.
111 Cong.Rec. 8987 (1965). *See also* 111 Cong. Rec. 8425, 8429, 8432, 8988 (1965) (Senator Williams); 111 Cong.Rec. 15983, 16246 (1965) (Representative Cramer), quoted *supra.*

**34.** The following individuals falsely registered in 1975 using addresses at which they did not live, and voted in the following year, as indicated by City of Philadelphia Voter's Permanent Registration Affidavits, in the 1976 primary or general elections at which federal candidates were on the ballot: Patricia DiGiambattista (defendant); Joseph Tully (defendant); Maryann Tully (defendant); Catherine Spagna (defendant); Vincent Spagna (defendant); Sheldon Keslinger (Government immunized witness); Joan Donaldson (Government immunized witness).

tor's amendment to mean that if, for instance—as I have known it to happen—20 people were registered in a house where there are only a few beds, and the question would arise of registration of a questionable character, could those persons be prosecuted under the Senator's amendment?

Mr. WILLIAMS of Delaware. The man who knowingly and willfully falsely registers would be subject to prosecution.

Mr. ELLENDER. You mean more people might be registered at an address on X Street than actually live there.

Mr. WILLIAMS of Delaware. Yes, if 20 people registered at that same address on X street, and it could be proved they did not live there, they could be prosecuted. If only 5 eligible persons lived at that address and 25 others had fraudulently registered, under my amendment those 25 persons who had fraudulently registered as living at that address would be considered as having registered illegally and could be subject to prosecution.

Likewise, if in the general election they voted as the result of this fraudulent registration, under my amendment they could be prosecuted. The person himself could be prosecuted under the amendment because he had given false information in registering.

By the same token, if a ward leader or someone else conspired with this person he too could be prosecuted. If there is a conspiracy between those illegally registering and a second party they can both be held responsible. Why should there not be some responsibility on the part of the man registering?

I support the section of the civil rights bill which was enacted last year which guaranteed our citizens the right to vote. I thought then we had dealt with the problem, but apparently we did not do it adequately. I am willing to guarantee that every man and woman shall have the right to vote, but if he does not wish to vote without being paid he should not be eligible to vote.

By the same token, when we guarantee that man the right to register he should have some responsibility that when he goes before the registrar he is giving the registrar the proper information and is not registering in a State or a district in which he does not qualify to vote.

111 Cong.Rec. 8425 (1965) (emphasis supplied).

■ Therefore, based on both a literal and extrinsic approach to the meaning and intent behind § 1973i(c), the Court finds that the statute was intended to include false *registrations* occurring in federal and non-federal election years and was intended to include only illegal *voting* activities using false information in federal elections.

III. *1975 Registration Form and Residence Under Pennsylvania Election Law*

■ Defendants argue that the indictment fails to allege sufficient facts to constitute a federal criminal offense because the 1975 voter registration form only specifies "No.—Street—House, Floor, Apt. or Room" without further explanation and is, therefore, vague and misleading. As a result, the defendants could not have misrepresented any material facts in completing the 1975 registration form, and could not have violated § 1973i(c). The Court finds their arguments to be without merit for two reasons. First, the 1975 Pennsylvania voter registration form is neither vague nor misleading and, accordingly, there can be a "knowing and willful" misrepresentation as to a material fact on that form under § 1973i(c).

To determine if the question on the 1975 form requesting the registrant's "No.—Street—House, Floor, Apt. or Room" is vague or misleading, the entire form must be examined to determine what a reasonable person would perceive that question to mean. See *Bronston v. U. S.*, 409 U.S. 352, 355–356 n.3, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973). As the form shows,[35] two other questions asked of a registrant pertain to the registrant's "address" and a reading of

---

**35.** *See* the complete text of the 1975 Pennsylvania Voter Registration Form at Appendix, *infra*.

all three questions in conjunction can only lead to the conclusion that the form was asking for the person's address or residence, as those terms are used by the most elementary person in every walk of life in contemporary America.

The form also contains an attestation clause, reproduced as follows:

I hereby swear, or affirm, that I am a citizen of the United States, that on the day of the next election I shall be of legal age, and shall have resided in the State of Pennsylvania for thirty days next preceding said election, and in the election district thirty days, that I am legally qualified to vote, that I have read (or have had read to me) the foregoing statements made in connection with my registration, and that they are true and correct. Any willful false statement made by me is perjury and punishable as such.

HIS OR HER

MARK

SIGNATURE OF VOTER

SUBSCRIBED AND SWORN TO BEFORE ME THIS

_____DAY OF_____19____

SIGNATURE OF REGISTRAR OR PERSON AUTHORIZED TO ACT AS REGISTRAR

(Actual size.) (Emphasis supplied).

By this clause, the registrant swears or affirms under oath to the truthfulness of the information in the presence of an official from the Philadelphia Voter Registration Division. In addition, it appears directly above the signature line and is not obscured in any way. *See U. S. v. Squires,* 440 F.2d 859, 865–866 (2d Cir. 1971) (Moore, J., concurring). Part of this attestation clause states that the signatory swears to be a "legally qualified voter," which, in turn, means that: (1) the person is legally registered to vote under Pennsylvania election law; and, (2) the person has registered using a valid legal residence as defined under state law. These provisions of law are based on Pennsylvania statutory and decisional law. The statute provides:

In determining the residence of a person desiring to register to vote, the following rules shall be followed so far as they may be applicable:

(a) That place shall be considered the residence of a person in which his habitation is fixed, and to which, whenever he is absent, he has the intention of returning.

(b) A person shall not be considered to have lost his residence who leaves his home and goes into another state or another election district of this State for temporary purposes only, with the intention of returning.

(c) A person shall not be considered to have gained a residence in any election district of this State into which he comes for temporary purposes only, without the intention of making such election district his permanent place of abode.

(d) The place where the family of a married man or woman resides shall be considered and held to be his or her place of residence, except where the husband and wife have actually separated and live apart, in which case the place where he or she has resided for two months or more shall be considered and held to be his or her place of residence.

(e) If a person removes to another state with the intention of making such state his permanent residence, he shall be considered to have lost his residence in this State.

(f) If a person removes to another state with the intention of remaining there an indefinite time and making such state his place of residence, he shall be considered to have lost his residence in this State, notwithstanding he may entertain an intention to return at some indefinite future period.

(g) If a person removes to the District of Columbia or other Federal territory or foreign country to engage in the government service, he shall not be considered to have lost his residence in this State during the period of such service, and the place where the person resided at the time of his removal shall be considered and held to be his place of residence.

(h) If a person goes into another state and while there exercises the right of a citizen by voting, he shall be considered to have lost his residence in this State.

25 P.S. § 2814.

Pennsylvania cases have established certain legal principles that are to be applied in addressing a question of residence under this statute. Perhaps the landmark decision in this area was by the Pennsylvania Supreme Court in *Stabile Registration Case,* 348 Pa. 587, 36 A.2d 451 (1944), which held, in relevant part:

The *fact* of any person's residence, for any legal purpose, whether for voting, or for holding office, or for taxation, has never been determined merely by that person's "say so". In determining that question the state brushes aside all colorable pretences and finds the reality behind the guise.

\* \* \* \* \* \*

. . . In *Fry's Election Case*, 71 Pa. 302 . . . , this court quoted with approval from Story's Conflict of Laws, sec. 41, as follows: "By the term 'domicil' in its ordinary acceptation, is meant the place where a person lives or has his home. In a strict legal sense that is properly the domicil of a person where he has his true, fixed, permanent home and principal establishment, and to which, whenever he is absent, he has the intention of returning." Justice Agnew added: "The term residence [as used in the Constitution] means the place where the elector makes his permanent or true home, his principal place of business, and *his family residence*, if he have one" (italics supplied).

\* \* \* \* \* \*

. . . When Stabile and his wife come to *that* home they come as they would come to a lodging house where they have the right to sleep and to eat and to entertain friends. It is not their permanent home, their place of domestic abode. It is a place where they are only transients, exactly as they would be at a hotel where they had similar privileges.

\* \* \* \* \* \*

. . . If by merely obtaining the privilege of occasionally lodging and eating and entertaining in another man's habitation, a person can obtain "legal residence" there, our decision in the *Dorrance* [*In re Dorrance's Estate*, 309 Pa. 151, 163

A. 303] case, supra, and the decision of the U. S. Supreme Court in the *Green* case (*State of Texas v. State of Florida* [306 U.S. 398, 59 S.Ct. 563, 83 L.Ed. 817]), supra, must be erroneous. We do not so consider them.

\* \* \* \* \* \*

Residence indicates permanency of abode as distinct from mere lodging or boarding.

348 Pa. at 591, 593–594, 36 A.2d at 453–454.

In the case before us, the Court duly instructed the jury on the above-settled principles of Pennsylvania voter registration law concerning "residence." [N.T. 8–64 to 67.] The Court also instructed the jury that persons registering to vote are presumed to know state election law concerning registration. [N.T. 8–65 to 71, 85, 86.] That instruction was given based on the evidence presented at trial as a conclusion of law, for the following reasons.

When a person swears under oath that (s)he is a "legally qualified voter," (s)he is affirming that (s)he has registered using a valid, legal residence for purposes of that registration. This presumption does not run afoul of the legal doctrine that, "Ignorance . . . as to a matter of law is a defense if . . . the ignorance negatives [sic] the . . . knowledge . . . required to establish a natural element of the offense. . . . " *U. S. v. Squires, supra*, 440 F.2d at 864, Model Penal Code § 2.04(1)(a) (A.L.I. Prop. Official Draft, 1962). As the Court instructed the jury, this means that, if a person acts inadvertently, accidentally or by good faith mistake, (s)he is not acting "knowingly or willfully" in giving false information as to their residence for purposes of establishing eligibility to register to vote, as required under § 1973i(c).[36] However, this defense is not

---

**36.** As Senator Tydings, a member of the Senate Judiciary Committee, stated during debate on the floor of the Senate as to the general meaning of the phrase "knowingly and willfully," used throughout the Voting Rights Act of 1965, 42 U.S.C. § 1973 *et seq.*:

Subsection 12(a) provides for the imposition of criminal penalties for "willfully and knowingly" depriving or attempting to deprive other persons of rights secured by certain enumerated sections of the act or for "willfully and knowingly" violating section 11. The phrase "willfully and knowingly"

without limitation. A person cannot act in bad faith by deliberately ignoring what is obvious [37] or close his eyes to facts that are true to a high probability. *See Leary v. U. S.*, 395 U.S. 6, 46 n.93, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969); *U. S. v. Jewell*, 532 F.2d 697, 700 (9th Cir. 1976); *U. S. v. Squires, supra*, 440 F.2d at 863. A person cannot deliberately fail to read or attempt to understand clear language to which (s)he is swearing under oath. *See U. S. v. Jewell, supra*, 532 F.2d at 702–703. Therefore, the Court concluded that, if a person attests that (s)he satisfies certain legal requirements under state election law, that person cannot be excused on the ground that (s)he did not understand the law (s)he attested to have knowledge of. As the court in *Ketchum v. Ward*, 422 F.Supp. 934 (W.D.N.Y. 1976), held:

> Fundamental fairness no doubt requires that an individual be given the opportunity to discover a statute's existence, applicability and meaning. Not every layman will read the Penal Code from cover to cover. But, if the statute in question is either clear in meaning upon reading, or sufficient to warn the layman that he should seek legal advice as to its applicability and meaning, it is proper to charge the potential violator with such knowledge of a law's applicability as he could obtain through competent legal advice . . . . If a competent lawyer is consulted, he should be able to predict whether the statute might be used as a basis for prosecuting his client. If the words of the statute and other related law make it impossible to make such a

prediction, a statute comes close to inadequate advance notice. . . .

422 F.Supp. at 941.

■ A person does not have to know with certainty that these laws exist or that a particular statute or decisional authority is applicable. A person need only be aware with a high probability of certainty that some illegality exists. *Leary v. U. S.*, 395 U.S. 6, 46 n.93, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969). Furthermore, if a person chooses to swear that an act is legal when (s)he is uncertain that it is in fact legal, the choice carries with it the duty of investigating the law. In the present case, there is a high probability that a registrant would be aware that the phrase "legally qualified to vote" might have a particular legal meaning, separate and distinct from the meaning those words might convey in casual conversation.[38] This is reinforced by the statement on the form that a penalty will be incurred for false swearing. Although there is a strong public policy supporting the mistake-of-law doctrine and the requirement that a person present a compelling justification to overcome it, *U. S. v. Barker*, 178 U.S.App.D.C. 174, 182 n.23, 546 F.2d 940, 948 n.23 (D.C.Cir. 1976), there are obvious and necessary exceptions to it. Such an exception is articulated in *U. S. v. Barker, supra*, 178 U.S.App.D.C. at 186–188, 546 F.2d at 952–954. There, the court relied upon the Model Penal Code, § 2.04(3)(b), which states:

> A belief that conduct does not legally constitute an offense is a defense to a prosecution for that offense based upon such conduct when: . . . (b) he acts in reasonable reliance upon an official statement of the law, afterward deter-

---

was inserted by the Judiciary Committee to make it clear that no criminal violation is involved where a person acts with due care and without knowledge of the relevant facts. To put it another way, action or inaction which deprives others of rights secured by the act but which is done or omitted inadvertently is not a basis for prosecution. This language was not intended to require a showing of any specific intent similar, for example, to that presently required under judicial constructions of 18 U.S.C. § 242. The same

language was inserted by the committee in section 12(c) for the same reason.
111 Cong.Rec. at 8369 (1965).

**37.** Defendants agree with this doctrine, as indicated in their Verbatum [*sic*] Jury Instruction as Proposed by Defendants Joseph R. Ricca, Ramon Meirino and Anthony Fiorentino, at 2.

**38.** The 1976 mail-in voter registration form also involved in the present action similarly contains the same attestation clause that appears on the 1975 form.

mined to be invalid or erroneous, contained in (i) a statute or other enactment; (ii) a judicial decision, opinion or judgment; (iii) an administrative order or grant of permission; (iv) an official interpretation of the public officer or body charged by law with responsibility for the interpretation, administration or enforcement of the law defining the offense.

In this case, the defendants presented no such defense. *Mauney v. U. S.*, 338 F.Supp. 1078, 1079 (E.D.Tenn.1971). The defendants did try to introduce the testimony of a solicitor to the Election Commission for the ostensible purpose of orally discussing what constituted his opinion of local law concerning residence. The Court refused the offer because defendants were unable to show that: (1) they had relied upon these opinions; or, (2) that these opinions were premised on some form of written or reported rulings of the Commission. [N.T. 6–189 to 194.] Also, an exception applies if the applicable law is vague or unclear because, then, a person's conduct can only be based on guesswork or uncertainty.

As the Supreme Court, in *Connally v. General Construction Co.*, 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926), held:

> [A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essentials of due process of law . .
>
> [T]he decisions of the court, upholding statutes as sufficiently certain [in other cases], rested upon the conclusion that they employed words or phrases having a technical or other special meaning, well enough known to enable those within their reach to correctly apply them . .
>
> or a well-settled common law meaning, notwithstanding an element of degree in the definition as to which estimates might differ.

269 U.S. at 391, 46 S.Ct. at 127–128, *quoted in Ketchum v. Ward, supra*, 422 F.Supp. at 940 (citations omitted).

This exception was evidenced in the case of *U. S. v. Squires, supra*, where a firearms purchase form required the purchaser to state whether (s)he had been a convicted felon under certain specified federal statutes. The *Squires* court held that:

> [W]e do believe that when the Government adopted the form it imposed upon itself an unusually difficult burden of proof as to a signer's knowledge of his criminality. It can safely be said that many lawyers would not have understood, without the benefit of research, the import in the original form of the certification provision. To require a layman, without any explanation, to sign such a certification at his peril appears to us to be quite unrealistic. While it is possible that a defendant may be shown to have sufficient familiarity with the cited statutes, all that we are saying here is that the obscure language of the certification provision was highly relevant to [the defendant's] knowledge, and that the trial court should have so instructed the jury.

440 F.2d at 865.

A parallel decision on this notion is *U. S. v. Bishop*, 412 U.S. 346, 93 S.Ct. 2008, 36 L.Ed.2d 941 (1973), which discussed the requirement that the defendant be shown to have "willfully" submitted a false tax return. The Court stated:

> This longstanding interpretation of the purpose of the recurring word "willfully" promotes coherence in the group of tax crimes. In our complex tax system, uncertainty often arises even among taxpayers who earnestly wish to follow the law. The Court has said, "It is not the purpose of the law to penalize frank difference of opinion or innocent errors made despite the exercise of reasonable care." *Spies*, 317 U.S. [492] at 496 [63 S.Ct. 364, 87 L.Ed. 418]. Degrees of negligence give rise in the tax system to civil penalties. The requirement of an offense committed "willfully" is not met, therefore, if a taxpayer has relied in good faith on a prior decision of this Court. The Court's consistent interpretation of the word "willfully" to require an element of *mens rea* implements the pervasive intent of Congress to construct penalties that

separate the purposeful tax violator from the well-meaning, but easily confused, mass of taxpayers.

412 U.S. at 360–361, 93 S.Ct. at 2017 (citations omitted).

 The law is clear that a person must be legally registered in order to vote. 25 P.S. § 2811. It is also clear that a person must have some factual connection or nexus with the address from which (s)he registers to vote. 25 P.S. § 2814. One basic principle particularly pertinent here is that a person cannot register from a residence with which (s)he has no nexus whatsoever. For example, defendant Fiorentino registered from 1433 South 6th Street, 3rd floor, using the 1975 voter registration form. However, before trial, he admitted to the federal grand jury that he had *never* lived at that address. [N.T. 4–217.] Therefore, the jury found under Pennsylvania law that defendant Fiorentino could not claim he was a resident of an address at which he had no factual nexus whatsoever. He attested, as did all registrants, on the 1975 registration form that he was "legally qualified to vote," thus, in effect swearing that, under Pennsylvania law, the registration was legally proper. Therefore, the jury was unquestionably entitled to find that defendant Fiorentino did not act inadvertently, by mistake or accident or by mistake of law, but acted "knowingly or willfully" in providing a false address with which to register to vote.

 Defendant Ricca also completed a 1975 voter registration form and attested that he, too, was "legally qualified to vote" at 1427 South 6th Street on the 2nd floor. He told the federal grand jury that he had "stayed there a few times, but that's not my permanent address." [N.T. 2–183.] He also told the FBI that "he stayed there on a couple of occasions in both 1974 and 1975 as a result of marital problems . . . never intend[ed] to abandon his residence." [N.T. 5–31.] There was no evidence to corroborate Ricca's claim that he was having

marital problems or that he was separated from his wife. *See* 25 P.S. § 2814. The testimony of several witnesses at trial indicated that Ricca had frequented the first floor apartment of defendant Cianciulli.[39] Ricca's counsel argued in her closing argument to the jury that Ricca did, in fact, live in the first floor apartment with defendant Cianciulli based on the above testimony and Ricca's prior statements. [N.T. 7–63 to 66.] However, Ricca's registration form indicated that he lived on the second floor and not the first floor of that building. The Pennsylvania registration law provides, and the jury was so instructed, that staying at an address infrequently, or simply stating that you reside at an address, is not sufficient to establish residence. *See Stabile Registration Case, supra,* 348 Pa. at 591, 593–594, 36 A.2d 451; 25 P.S. § 2814. Based on these facts and the applicable law, the Court finds the jury had a clear basis to find that Ricca acted in deliberate disregard of state law on residence and did not act by mistake, accident or inadvertence and did so "knowingly or willfully."

In conclusion, the defendants' claim on these grounds lacks merit.

## IV. *Jury-Tampering Incident*

Finally, defendants Ricca and Fiorentino claim that they were deprived of a full, fair and public trial because the jurors were prejudiced by a possible jury-tampering incident. The Court rejects the defendants' contentions for several reasons.

The factual background surrounding this incident is as follows: On Friday, September 14, 1979, which was the second full day of the trial, alternate juror Joan Olejkowsky was approached by an unidentified male at the elevators outside the courtroom after the Court had recessed for the day. The male asked her where she lived and whether he could give her a ride home. She declined the offer and left the courthouse. On Monday, September 17, 1979, juror Olejkowsky told other jurors of the incident and

---

**39.** *See* testimony of the following witnesses: Anthony Lucidino and Dr. Leopold Salkind, who testified on September 20, 1979, as indi-cated in the Court's bench notes and the Court Reporter's official notes; Salvatore Cannistraci, N.T. 1–165, 166, 177.

asked them whether she should report the incident to the Court. Some of the jurors said that she should notify the Court, which she did that day by informing the courtroom deputy clerk of the incident, who, in turn, notified the trial judge. The Court instructed the clerk to tell the juror, out of the presence of the other jurors, to immediately advise the clerk if she noticed the male in the courtroom. She did not see the male in the courtroom that day, but did see him the following day, September 18, and so notified the clerk. Pursuant to the Court's instruction, the male was questioned by agents of the FBI. The person identified himself to the FBI as the brother of defendant Fiorentino. When this information was reported to the Court, the trial was recessed and the Court notified the defendants and their counsel of the incident. [N.T. 5–83.] Thereafter, the Court undertook an individual *voir dire* of the juror involved, as well as a separate *voir dire* of all of the other jurors. This was done in the presence of the defendants and counsel and was on the record. The Court asked the juror involved whether she had talked to any other jurors about the incident and whether she had been prejudiced by the incident in any way. She said that she had only told the other jurors initially about the occurrence of the incident but had not talked about the case with them. She also stated, under oath, that she did not know the identity of the male who had approached her and that some of the other jurors had told her that they also had seen him. [N.T. 5–86 to 90, 5–100 to 102.] The other jurors were asked: (1) whether they knew about the incident involving juror Olejkowsky and whether she had told them about it or if they knew who the male was; (2) if they would be prejudiced in any way by the incident; and, (3) whether they could still render a fair and impartial verdict based solely on the evidence presented. All of the jurors testified, under oath, that they did not know who the male was; that they did not associate him with either the

Government or the defense; and, that the incident would *not* affect their impartiality and fairness to decide the instant action. [N.T. 5–104 to 133, 6–3 to 12.] The Court ruled that the jury should be sequestered forthwith for the remainder of the trial. [N.T. 5–82.] None of the jurors were told then or at any time during the remainder of the trial why they had been sequestered and they were not advised of the identity of the male who had approached juror Olejkowsky.

Counsel for Ricca filed an affidavit on October 1, 1979, five days after the trial, and attached to Ricca's post-trial motion, advising the Court for the first time of another related matter. She says in her affidavit that, while the jury was deliberating, she was approached by a person in the courthouse corridor who identified himself as the boyfriend of juror Olejkowsky. He supposedly told her that juror Olejkowsky had told him of being approached by an unknown male and that he had advised her to notify the Court. The affidavit stated, "He also stated that Ms. Olejkowsky has served on juries before but 'never anything like this' and he added 'after this case she said she'll never vote again.' " [40] This incident was not reported to the Court when it occurred, and it was not brought to the Court's attention when the verdict was returned. The first time the Court was informed of the incident was in Ricca's post-trial motion.

Three separate questions emerge from this incident. First, was the jury, as a whole, prejudiced by the incident involving the outside contact with juror Olejkowsky to the extent that they were unable to return an impartial verdict based solely on the evidence and not on any outside influence? Second, does the incident involving the conversation between juror Olejkowsky's boyfriend and defense counsel constitute sufficient proof that juror Olejkowsky was adversely prejudiced by the communication with the brother of defendant Fior-

---

**40.** Defendants Ricca and Fiorentino's Motion for Judgment of Acquittal, Motion for Arrest of Judgment and Motion for New Trial, affidavit of Helen T. M. McCaffrey, Esq., dated October 1, 1979.

entino? Third, did juror Olejkowsky violate the Court's instructions not to discuss the "case" with either the other jurors (until jury deliberations commenced) or with any third party during the course of the trial?

The classic test to be applied in cases of improper contact with a jury or juror was best stated by the United States Supreme Court in *Remmer v. U. S.*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954):

> . . . [A]ny private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.

347 U.S. at 229, 74 S.Ct. at 451. *See also Allen v. U. S.*, 376 F.Supp. 1386, 1388 (E.D. Pa.1974); *U. S. v. Marine*, 84 F.Supp. 785, 787 (D.Del.1949); *U. S. v. Rakes*, 74 F.Supp. 645, 648 (E.D.Va.1947).

The approach to be taken when deciding these questions is set forth in *Allen v. U. S., supra*:

> [T]he Court must apprise the defendant of the fact of any private communication and must take evidence concerning the identity of those involved and the nature and extent of the communication. Normally the participants would be questioned as to the content of the communication, who was present and who overheard the communication. However, the approach taken by the trial judge in a given case is left to his discretion.

376 F.Supp. at 1389, *relying upon Morgan v. U. S.*, 399 F.2d 93, 96 (5th Cir. 1968); *see also U. S. v. Rakes, supra*, 74 F.Supp. at 648.

▆▆▆ In the case at bar, this approach was followed, to the letter. The defendants were informed of the incident as soon as the outsider was identified so that a meaningful inquiry could be initiated. A full inquiry was conducted into all features of the incident and proper instructions were thereafter given. [N.T. 5–104 to 133, 6–3 to 12.][41] The Court was fully satisfied then, and remains so, that there was no prejudice to any defendant because of the juror contact.

Second, as to the incident outlined by Ricca's counsel, involving statements allegedly made by juror Olejkowsky to her boyfriend and later communicated to defense counsel, defendants request a new trial pursuant to Fed.R.Crim.P. 33, presumably on the ground of "newly discovered evidence." The statements of juror Olejkowsky, the defendants contend, support their contention that she was indeed prejudiced by the incident.

In considering this contention, assessments of materiality and due diligence should be considered. *See Brodie v. United States*, 111 U.S.App.D.C. 170, 173, 295 F.2d 157, 160 (D.C.Cir. 1961).

▆▆▆ Newly discovered evidence would be material here if it tended to prove prejudice of the type that would have destroyed juror Olejkowsky's impartiality and fairness to decide the case. The Court finds that no such showing has been offered. The affidavit itself is equivocal and relates facts unconnected to any issue the jury was to decide. Moreover, it is consistent with the testimony of the juror taken in court under oath. [N.T. 5–86 to 90, 100 to 102.] *See U. S. v. Gottfried*, 165 F.2d 360, 365 (2d Cir. 1948).

If this episode is as material as counsel argue it is, it is crucial to note here that defense counsel, despite a duty and an opportunity to do so, failed to bring the matter to the Court's attention when it could have taken some further action. Even

---

**41.** Individual *voir dire* of jurors has been sanctioned as an appropriate manner of rebutting the presumption of prejudice stemming from a communication between a juror and a third party. *See Allen v. U. S., supra*, 376 F.Supp. at 1388–1390.

though the Court asked counsel twice in open court, *before* the jury was discharged, whether they had "anything further," [42] counsel stood silent. [43] Such strategy, under whatever name, is nevertheless a conscious and informed choice and it has its advantages, as well as its shortcomings. For a pertinent example, *see, e. g., Green v. U. S.,* 256 F.2d 483, 484 (1st Cir. 1958) ("But Green cannot have it both ways. He cannot withhold the evidence, gambling on an acquittal without it, and then later, after the gamble fails, present such withheld evidence in a subsequent proceeding . . . ."); *U. S. v. McGrady,* 191 F.2d 829, 831 (7th Cir. 1951) ("The record does not disclose that any remarks were in fact made in the presence of the jurors. It does, however, disclose that defendant knew of the incident just related before the trial had been concluded. But it was not called to the trial judge's attention, nor was he asked to rule in the matter before the jury returned to consider the verdict."); *U. S. v. Gottfried,* 165 F.2d 360, 365 (2d Cir. 1948); *U. S. v. Soblen,* 203 F.Supp. 542, 564–566 nn.13–14 (S.D.N.Y.1961), *aff'd,* 301 F.2d 236 (2d Cir. 1962) ("Where the allegedly newly discovered evidence was known by the defense or readily obtainable by it before or during trial and the defense trial strategy was not to utilize such new or obtainable evidence during trial, the decision by the defense to change its strategy after an unfavorable verdict does not render the evidence 'newly discovered.'"). *See also U. S. v. Norman,* 402 F.2d 73, 78 (9th Cir. 1968).

On the issue of whether further investigation of the incident is warranted, the test, as applied by the Second Circuit Court of Appeals in *U. S. v. Krulewitch,* 167 F.2d 943 (2d Cir. 1948), is as follows:

> Upon such a weak showing the district judge was well within the exercise of his

sound discretion in denying the motion without further investigation as to the actual facts. It does not appear that any reason was given him to believe that further investigation would add evidence to support the motion and the credibility of the bailiff was so shaken by his repudiation of his first affidavit that the affidavit of the forelady was, and should have been, held sufficient to defeat the motion on the facts.

167 F.2d at 950.

Moreover, the Third Circuit Court of Appeals discussed post-trial jury *voir dire* in *U. S. ex rel. Daverse v. Hohn,* 198 F.2d 934 (3d Cir. 1952):

> But we wish to make plain that we join the court below in disapproving in general the practice of interviewing a juror after a trial as to his state of mind during the trial. There may conceivably be special circumstances which could justify such a course but we do not find them here. A full exercise of the right of *voir dire* examination ordinarily will afford a defendant ample opportunity to ascertain the qualifications of a prospective juror and to determine whether he possesses bias and prejudice.

198 F.2d at 938–939. *See also U. S. v. Nystrom,* 116 F.Supp. 771, 777 (W.D.Pa. 1953).

 Finally, the defendants claim that the conversations between juror Olejkowsky and the other jurors and her boyfriend were in direct violation of the Court's instructions that the "case" should not be discussed with the other jurors before the final deliberations or with third persons. [N.T. 1–19 to 21.]

There is no evidence that juror Olejkowsky discussed the "case" with anyone. As she stated during her individual *voir dire :*

---

**42.** Court's bench notes and Court Reporter's official notes (September 24, 1979).

**43.** This Court has adopted as the standard of conduct the Code of Professional Responsibility, which states:

> A lawyer shall reveal promptly to the court improper conduct by a venireman or a juror, or by another toward a venireman or a juror or a member of his family, of which the lawyer has knowledge.
> DR 7–108(G).

When I came in on Monday I said that, you know, I had been approached by someone, but I didn't talk anything to him other than saying no and no, because we were instructed not to talk to anybody in case he could have any bearing on the case.

N.T. 5–89.

Therefore, the Court finds that its instructions were not violated by juror Olejkowsky.

V. *Conclusion*

 For all the above reasons, all of the defendants' post-trial motions for a new trial, judgment of acquittal and motion for arrest of judgment were denied by the Court's Order dated October 23, 1979. The foregoing Memorandum Opinion is in support of that Order.[44]

### APPENDIX

Following is a reproduced sample of the Voter's Permanent Registration Affidavit, in actual size:

44. The Court finds the following additional claims raised in defendants' post-trial motions to be totally without merit: (1) circumstantial evidence is admissible to prove state of mind of a defendant. Exculpatory statements made by the defendant when later proven to be false are "circumstantial evidence of guilty consciousness and have independent probative force." *U. S. v. Smolin*, 182 F.2d 782, 786 (2d Cir. 1950); however, whether the statements are false in fact, and the weight that should be attributed to them, are matters for the jury as the trier-of-fact. *Government of Virgin Islands v. Lovell*, 378 F.2d 799, 806–807 (3d Cir. 1967). In the instant action, defendant Ricca claimed before the federal grand jury and FBI that he lived at the address from which he registered. As shown at trial, this statement was proven to be false in fact and in law; (2) the verdict was not contrary to the weight of the evidence, as indicated in the Court's previous discussion of the evidence presented; (3) the Court did not err in denying defendants' numerous motions for a mistrial; and, (4) the defendants' claims— that the Court failed to charge the jury as *per* the defendants' requested points for charge concerning intent and that the Government failed to prove an essential element of Count 36 of the indictment—are both phrased with no semblance of particularity and, therefore, are not presented in compliance with the requirements of Local Rule of Criminal Procedure 14 (E.D.Pa.).

16-8 (REV. 9/73)

## CITY OF PHILADELPHIA
## VOTER'S PERMANENT REGISTRATION AFFIDAVIT

Nº 264162-8

SURNAME (PRINT) | FIRST NAME OR NAMES | NO. | STREET | HOUSE, FLOOR, APT. OR ROOM

OCCUPATION | COLOR | SEX | HEIGHT | COLOR OF EYES | COLOR OF HAIR

WHERE BORN | EXACT DATE OF BIRTH | HOW LONG IN DIST. | HOW LONG IN STATE

### NATURALIZATION DATA

PAPERS | DATE OF PAPERS | COURT | CITY AND STATE

OWN
FATHER'S
MOTHER'S
HUSBAND'S

NO. ON PAPERS

NAME OF PERSON OR PERSONS THROUGH WHOM NATURALIZED AND IF HUSBAND DATE AND PLACE OF MARRIAGE

DESIGNATION OF POLITICAL PARTY FOR PRIMARY VOTE

DATE | PARTY AFFILIATION

ADDRESS FROM WHICH LAST REGISTERED | YEAR

ADDRESS FROM WHICH LAST VOTED | YEAR

STATE EXACT NATURE OF DISABILITY OR ILLITERACY ONLY IF ASSISTANCE IS NEEDED

State of Pennsylvania } ss.:
County of Philadelphia }

I hereby swear, or affirm, that I am a citizen of the United States, that on the day of the next election I shall be of legal age, and shall have resided in the State of Pennsylvania for thirty days next preceding said election, and in the election district thirty days, that I am legally qualified to vote, that I have read (or have had read to me) the foregoing statements made in connection with my registration, and that they are true and correct. Any willful false statement made by me is perjury and punishable as such.

HIS OR HER

MARK

SIGNATURE OF VOTER

SUBSCRIBED AND SWORN TO BEFORE ME THIS

_____ DAY OF _____ 19 ___

SIGNATURE OF REGISTRAR OR PERSON AUTHORIZED TO ACT AS REGISTRAR

**TO ELECTION BOARD:** If this space is left blank NO assistance is to be given.

DATE | NEW ADDRESS

SURNAME | FIRST AND MIDDLE NAME | ADDRESS

OCCUPATION | WARD | DIV. | PARTY AFFILIATION

7TH SERIES 200M 7-69